2006 UT App 516

**GLACIER LAND CO., L.L.C., a Utah limited liability company; Glacier Land Development Co., L.L.C., a Utah limited liability company, Plaintiffs, Appellees, and Cross-appellants,**

v.

**CLAUDIA KLAWE & ASSOCIATES, L.L.C., a Utah limited liability company; and Claudia Klawe, an individual, Defendants, Counterclaimants, Third-party Plaintiffs, Appellants, and Cross-appellees,**

v.

**Glacier Land Co., L.L.C., a Utah limited liability company; Glacier Land Development Co. L.L.C., a Utah limited liability company; David Gough, an individual; Daniel L. Vranes, an individual; and Brent R. Shaw, an individual, Counterdefendants and Third-party Defendants.**

No. 20050265–CA.

Court of Appeals of Utah.

Dec. 29, 2006.

See also 138 P.3d 109.

Stephen P. Horvat and Thomas R. Karrenberg, Anderson & Karrenberg, Salt Lake City, for Appellants.

Bruce R. Baird, Hutchings Baird Curtis & Astill, Sandy, for Appellees.

Before BENCH, P.J., GREENWOOD, Associate P.J., and McHUGH, J.

McHUGH, Judge:

¶ 1 Appellants Claudia Klawe and Claudia Klawe & Associates, L.L.C. (collectively, Klawe) appeal the trial court's grant of partial summary judgment to Appellees Glacier Land Company and Glacier Land Development Company (collectively, Glacier). The court determined that a marketing agreement between Klawe and Glacier contained an indefinite term of duration and was therefore terminable at will. Klawe also seeks review of two of the trial court's rulings regarding witness testimony. First, Klawe challenges the trial court's exclusion of Claudia Klawe's testimony concerning the assignment of the duties under the exclusive marketing agreement. Second, Klawe asserts it was error for the trial court to allow a rebuttal witness for Glacier to testify when that witness was not listed in pretrial disclosures. Finally, Glacier cross-appeals the trial court's denial of a motion for attorney fees.[1] We affirm in part and reverse and remand in part.

## BACKGROUND

¶ 2 Because this is an appeal from a grant of summary judgment, we recite "the facts and all reasonable inferences drawn there-

---

1. Glacier also sought review of a number of the trial court's other rulings. However, that portion of the appeal was not timely filed and was dismissed as beyond the jurisdiction of this court. *See Glacier Land Co. v. Claudia Klawe & Assocs.*, 2006 UT App 209, 138 P.3d 109.

from in the light most favorable to the non-moving party." *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 399 (Utah 1998) (quotations and citation omitted). This suit arises out of a disagreement over the marketing and sale of high-end residential homes in the Monte Luca development (Monte Luca), located on Danish Road in Sandy, Utah. On August 4, 1999, Glacier entered into an oral agreement with Claudia Klawe (Claudia), an associate broker affiliated with Coldwell Banker Premier (Coldwell),[2] regarding the exclusive right to market and sell the homes built within the Monte Luca subdivision. At the time of the agreement, the Monte Luca development plan provided for the construction of forty units that would be built to buyer specifications. However, construction had not yet begun on any units.

¶ 3 Under the agreement, Claudia was granted the exclusive right to act as the real-estate agent for the development until all forty of the planned units were sold. In exchange for that right, Claudia agreed to list and promote the project, contribute twenty-five percent of the marketing expenses, and accept a reduced commission on sales. Between the time of the initial oral agreement and the commencement of litigation, the parties memorialized certain aspects of their agreement, including Claudia's right to act as exclusive agent until all units were sold, in several different documents. One of those documents, entitled Marketing Agreement, was executed on August 4, 1999, and stated:

> [Claudia] shall be the *exclusive real estate agent* for the aforementioned properties. Claudia ... shall have the autonomy to implement a successful marketing campaign and to follow through with the listings, sales and closings *of all properties.*

(Emphases added.) Similarly, another document entitled Listing Agreement & Agency Disclosure form was executed on October 17, 2001, and generally provided that Claudia would be the exclusive listing agent for "40 stand alone residences [at] Monte Luca" until the sell out date.[3]

¶ 4 In the fall of 2000, Glacier began construction on Monte Luca and started to accept contracts for individual units. Klawe began performing under the agreement by initiating a marketing campaign which included a website, printed materials, and listings for the properties on the Wasatch Front Regional Listing Service (MLS). Klawe also started to secure contracts for the sale of the Monte Luca units.

¶ 5 In April 2001, Glacier expanded the Monte Luca project by acquiring the Steed Property—an adjoining parcel on Danish Road—that could accommodate an additional two or three units. During the transaction, Claudia acted as Glacier's agent and earned a $14,000 commission. Instead of collecting the commission, however, Klawe credited the $14,000 to Glacier in exchange for a modification of the oral Monte Luca exclusive marketing agreement. The modification provided that the additional two or three units planned on the Steed Property would be included within the terms of the exclusive marketing agreement. Glacier accepted the $14,000 and agreed to the modification, expanding Klawe's exclusive right to act as real estate agent for forty-two[4] planned units in the Monte Luca development—forty from the development as originally planned plus two more units to be built on the Steed Property. On April 23, 2001, the parties memorialized aspects of the oral modification by executing an Addendum to

---

2.  Claudia Klawe later terminated her affiliation with Coldwell and created Claudia Klawe & Associates Inc. to act as her principal broker.

3.  Specifically the Listing Agreement & Agency Disclosure form had been filled out to read: The Seller hereby grants the Company, including *Claudia Klawe* ... as the authorized agent for the Company, for the period of *until sold* months starting at the execution of this listing agreement, and ending at 5:00 P.M. on the *sell* ~~day of~~ *out date* ~~199~~ , ... the Exclusive Right to Sell, Lease, or Exchange certain real prop-

erty owned by the Seller, described as: *40 stand alone residences [at] Monte Luca ....* Portions of the text that are underscored represent blanks in the form that were filled in by hand with the indicated language. Text represented with a strike-through was pre-printed on the form and crossed out by hand.

4.  Although the Steed Property could accommodate two or three additional units, for convenience we refer to the total number of units within Monte Luca as forty-two.

the Real Estate Listing Agreement. And later, on January 7, 2002, the parties executed two additional Listing Agreement & Agency Disclosure forms that generally indicated that they covered "42 stand alone residences [at] Monte Luca," and would be in effect until the "sell out date."

¶ 6 In June 2002, the relationship between the parties began to deteriorate when David Gough, a Glacier principal, decided to purchase one of the forty-two units in Monte Luca covered by the exclusive marketing agreement. In the transaction, Gough challenged Klawe's right to receive a commission on the sale. When Claudia attempted to discuss the commission with Gough, he became threatening and verbally abusive. After the altercation, Klawe temporarily assigned Claudia's duties under the exclusive marketing agreement to another agent and sent a letter to Glacier stating that the reason for the reassignment was "unethical and improper business conduct" on the part of Glacier. On July 15, 2002, Glacier attempted to terminate its relationship with Klawe, citing poor sales performance as the reason for termination. Shortly after the attempted termination, on August 9, 2002, Glacier brought suit against Klawe seeking a temporary restraining order to compel Klawe to release control over the Monte Luca listings on the MLS.[5] Klawe counterclaimed against Glacier and alleged causes of action for breach of contract, unjust enrichment, and fraudulent misrepresentation.

¶ 7 Glacier sought partial summary judgment with respect to Klawe's breach of contract claim. For purposes of that motion, Glacier stipulated to the fact that the parties had entered into the exclusive marketing agreement and that the agreed duration of the contract was until all forty-two of the Monte Luca units were sold. Glacier then argued that even assuming those facts, Klawe was not entitled to relief as a matter of law because the contract was for an indefinite duration and, therefore, terminable at will by either party. Klawe countered that the duration of the contract was definite

because, although no calendar date or temporal term had been adopted, the parties had nonetheless agreed that the contract would terminate upon the happening of a defined event—the sale of all the Monte Luca units. The trial court agreed with Glacier, finding that, as a matter of fundamental contract principles, the parties' contract "lack[ed] definiteness, lack[ed] a period of duration that is certain and as a result can only be argued as, can only be determined as being at-will." Thus, the court granted Glacier partial summary judgment on Klawe's breach of contract claim.

¶ 8 Klawe's unjust enrichment and fraud-based claims proceeded to trial. At trial, Klawe attempted to introduce Claudia's testimony relating to the altercation between herself and Gough that led to the assignment of her duties under the exclusive marketing agreement. The trial court excluded the testimony under rule 403 of the Utah Rules of Evidence, finding that the evidence was not particularly probative of the issues raised by Klawe's unjust enrichment and fraud claims and had "a tremendous potential for being prejudicial."

¶ 9 However, Claudia was allowed to testify as to her reliance on the exclusive marketing agreement including the until-sold provision. During cross-examination, Glacier's counsel asked Claudia if, for the period of time she was at Coldwell, she believed that Coldwell would have accepted a listing agreement specifying a duration of until sold. Claudia answered in the affirmative indicating that she did believe Coldwell would have accepted such a listing. Following Claudia's testimony, Glacier called Dennis Marchant, managing broker for Coldwell, to testify that Coldwell would not have accepted an until-sold listing agreement. However, Marchant had not been designated in Glacier's pretrial disclosures under rule 26 of the Utah Rules of Civil Procedure. Klawe moved to exclude Marchant's testimony under rule 37(f) of the Utah Rules of Civil Procedure on the ground that he had not been previously disclosed. Glacier argued that Marchant's testimony

5. Glacier also initiated claims including, but not limited to, breach of fiduciary duty, breach of contract, and intentional interference with economic relations. However, because these claims are not within the subject matter of this appeal, they will not be discussed further.

was being offered merely to impeach Claudia's testimony that she believed that Coldwell would have accepted an until-sold listing agreement; and therefore, Glacier was not required to designate Marchant in its pretrial disclosures. Klawe disagreed, contending that because Claudia had only testified as to her belief, she could not be impeached by Marchant's proposed testimony. Therefore, Klawe characterized Marchant as a rebuttal witness, not solely for impeachment, that must be listed in the pretrial disclosures. Ultimately, the trial court denied Klawe's motion to exclude Marchant's testimony. The trial court determined that even if Klawe was correct in characterizing Marchant's testimony as rebuttal testimony, not solely for impeachment purposes, that "it just goes without saying that rebuttal witnesses do not have to be disclosed in initial disclosures."

¶ 10 Eventually, the case was submitted to the jury which returned its verdict on February 7, 2005. Klawe was awarded $17,000 in damages representing commission on the sale of a single Monte Luca unit that had been placed under contract in the summer of 2002. The jury otherwise denied all other claims by both parties. On February 15, 2005, Glacier filed a motion for judgment notwithstanding the verdict under rule 50 of the Utah Rules of Civil Procedure, arguing that the award of $17,000 to Klawe was not supported by the record. The trial court entered final judgment on February 23, 2005. The parties objected to the form of the judgment, and the trial court entered an amended final judgment on March 11, 2005. The amended final judgment included the trial court's denial of Glacier's motion for judgment notwithstanding the verdict. Neither party moved for attorney fees prior to the entry of the final judgment or the amended final judgment and no attorney fees were awarded in either judgment. Klawe filed a notice of appeal on March 16, 2005. On March 30, 2005, two weeks after Klawe's notice of appeal, Glacier filed a motion seeking an award of attorney fees. The trial court initially granted the motion but later, after complete briefing, reversed itself, ultimately denying Glacier an award of attorney fees upon finding that the motion had been untimely filed because it was made after the entry of final judgment and Klawe's notice of appeal. Both Klawe and Glacier appealed.

## ISSUES AND STANDARDS OF REVIEW

¶ 11 First, Klawe challenges the trial court's grant of partial summary judgment with respect to its claim for breach of the exclusive marketing agreement. "Summary judgment must be supported by evidence, admissions, and inferences which when viewed in the light most favorable to the losing side establish that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Rose v. Allied Dev. Co.*, 719 P.2d 83, 84 (Utah 1986) (quoting Utah R. Civ. P. 56(c)). Thus, when "deciding whether the trial court correctly granted [summary] judgment as a matter of law, we give no deference to the trial court's view of the law; we review it for correctness." *Uintah Basin Med. Ctr. v. Hardy*, 2002 UT 92, ¶ 7, 54 P.3d 1165 (alteration in original) (quotations and citations omitted).

¶ 12 Second, Klawe seeks review of the trial court's exclusion of Claudia's testimony regarding the altercation between herself and Gough on the ground that the evidence was unduly prejudicial under rule 403 of the Utah Rules of Evidence. Generally, a trial court is given broad discretion to admit or exclude evidence under rule 403. *See State v. Pena*, 869 P.2d 932, 938 (Utah 1994). Thus, "[w]e review a trial court's decision to admit or exclude evidence under [r]ule 403 ... under an abuse of discretion standard, and will not overturn a lower court's determination of admissibility unless it is 'beyond the limits of reasonability.'" *Diversified Holdings, L. C. v. Turner*, 2002 UT 129, ¶ 6, 63 P.3d 686 (quoting *State v. Real Property at 633 E. 640 N.*, 942 P.2d 925, 930 (Utah 1997)). Additionally, "[e]ven if the evidence was erroneously admitted, that fact alone is insufficient to set aside a verdict unless it has had a substantial influence in bringing about the verdict." *State v. Bluff*, 2002 UT 66, ¶ 47, 52 P.3d 1210 (quotations and citation omitted); *see also* Utah R. Evid. 103(a) (providing that an erroneous ruling requires reversal only if "a substantial right of the party is affected").

¶ 13 Third, Klawe asserts that the trial court committed error when it allowed Marchant to testify as to whether Coldwell would have accepted an until-sold listing agreement because Marchant was a rebuttal witness, not solely for impeachment, and was therefore required to be listed in Glacier's pretrial disclosures. We review a trial court's decision to deny a motion for discovery sanctions under a bifurcated standard. *See Stevenett v. Wal–Mart Stores, Inc.*, 1999 UT App 80, ¶ 8, 977 P.2d 508. First, to the extent the issue on appeal required the trial court "to interpret rules of civil procedure, it 'presents a question of law which we review for correctness.'" *Harris v. IES Assocs., Inc.*, 2003 UT App 112, ¶ 25, 69 P.3d 297 (quoting *Nunley v. Westates Casing Servs., Inc.*, 1999 UT 100, ¶ 42, 989 P.2d 1077). Second, we review a trial court's refusal to impose sanctions, such as a failure to exclude evidence under rule 37 of the Utah Rules of Civil Procedure, for "'an abuse of discretion.'" [6] *Id.* (quoting *Featherstone v. Schaerrer*, 2001 UT 86, ¶ 31, 34 P.3d 194). However, even where the trial court committed error, we will reverse the trial court's ruling only if the erroneous decision regarding the admissibility of evidence is harmful. *See* Utah R. Civ. P. 61 ("No error in . . . the admission or the exclusion of evidence . . . is ground for granting a new trial or otherwise disturbing a judgment or order, unless refus-

al to take such action appears to the court inconsistent with substantial justice."). More specifically, we will only reverse the trial court "if absent the error there is a reasonable likelihood of an outcome more favorable to the [complaining party]." *State v. Lindgren*, 910 P.2d 1268, 1271 (Utah Ct.App.1996) (quotations and citation omitted).

¶ 14 Finally, Glacier cross-appeals the trial court's denial of attorney fees for failure to timely file. "A trial court's conclusion that a request for attorney fees is waived if not made at trial is a legal conclusion. We review a trial court's conclusions of law for correctness, granting no deference to the trial judge's legal determinations." *Meadowbrook, L.L.C. v. Flower*, 959 P.2d 115, 116 (Utah 1998).

## ANALYSIS

### I. Summary Judgment

¶ 15 Klawe asserts that the trial court erred when it granted Glacier's motion for partial summary judgment and dismissed Klawe's contract claims arising out of the exclusive marketing agreement. Klawe argues that it was erroneous for the trial court to summarily enter judgment against it on its breach of contract claim on the ground that the agreement was terminable at will by either party.[7] We agree.

---

6. Klawe asserts that because Marchant's testimony was not offered solely for impeachment, the exclusion of Marchant's testimony was mandatory under rule 37(f) of the Utah Rules of Civil Procedure. Therefore, Klawe contends, the trial court lacked discretion to award or deny sanctions. We disagree. Klawe relies on the language of rule 37(f) which provides that if a party fails to disclose a witness, as required by rule 26(a), "that party *shall not* be permitted to use the witness." Utah R. Civ. P. 37(f) (emphasis added). However, Klawe removes rule 37(f) from its context. Rule 37(f) states:

> If a party fails to disclose a witness, . . . that party shall not be permitted to use the witness, . . . unless the failure to disclose is harmless or the party shows good cause for the failure to disclose. In addition to or in lieu of this sanction, the court may order any other sanction, including payment of reasonable costs and attorney fees, any order permitted under subpart (b)(2)(A), (B), or (C) and informing the jury of the failure to disclose.

Utah R. Civ. P. 37(f). Thus, although rule 37(f) begins with the mandatory language cited by

Klawe—that if a party fails to disclose a witness that party *shall not* be permitted to use the witness—the remainder of the rule demonstrates that the trial court retains broad discretion in choosing an appropriate sanction for failure to disclose a witness. *See id.* For example, the trial court may decline sanctions altogether upon a finding that the failure to disclose is harmless or that the party had good cause for failure to disclose. *See id.* Additionally, it is within the trial court's discretion to impose alternative sanctions under rule 37(b)(2)(A), (B), or (C), or to limit sanctions to informing the jury as to the party's failure to disclose. *See id.* Therefore, we review a trial court's award or denial of sanctions under rule 37(f), like decisions under other subsections of rule 37, for an abuse of discretion. *See Harris v. IES Assocs., Inc.*, 2003 UT App 112, ¶ 25, 69 P.3d 297.

7. Exclusive listing agreements for the sale, lease, or exchange of real property are properly treated as contracts for employment and are subject to Utah's at-will presumption. *See Gump & Ayers Real Estate, Inc. v. Domcoy Investors V*, 733 P.2d

## A. *Utah's At–Will Presumption*

¶ 16 "Utah's employment law presumes that all employment relationships entered into for an indefinite period of time are at-will, where the employer or the employee may terminate the employment for any reason (or no reason) except where prohibited by law." *Hansen v. America Online, Inc.*, 2004 UT 62, ¶ 17, 96 P.3d 950; *see also Rackley v. Fairview Care Ctrs. Inc.*, 2001 UT 32, ¶ 12, 23 P.3d 1022 ("Under Utah law, an employment relationship entered into for an indefinite period of time is presumed to be at-will and gives rise to a contractual arrangement where the employer or the employee may terminate the employment for any reason, except as provided by law."). Glacier restates the at-will presumption as a rule of contract construction and argues that, under Utah law, any employment contract is at-will, terminable at any time by either party unless the parties agree to a definite term of duration. Additionally, Glacier urges a narrow interpretation of definite duration that includes only those employment contracts that specify a calendar date for termination, a specific length of time for performance, or a terminating event that is certain to occur.

¶ 17 Thus, Glacier argues that because the exclusive marketing agreement provides that the duration is until all forty-two of the Monte Luca units are sold, without providing a calendar date for expiration or a measurement of time for performance, it was terminable at the will of either party. Klawe has implicitly accepted Glacier's framing of the at-will rule and has primarily argued for a broader interpretation of definite duration that would include the "until sold" term of the exclusive marketing agreement, thus, placing it outside the at-will rule. We recognize that some other states have adopted an at-will rule similar to the interpretation proposed by Glacier.[8] *See, e.g., Schultz v. Hill*, 2002–0835, pp. 5–6 (La.App. 1 Cir. 2/14/03), 840 So.2d 641 (interpreting statute under which "a contract of employment for an indefinite duration may be terminated at the will of either party" (quotations and citation omitted)); *Taliento v. Portland W. Neighborhood Planning Council*, 1997 ME 194, ¶ 9, 705 A.2d 696 (applying at-will rule); *Aaland v. Lake Region Grain Coop.*, 511 N.W.2d 244, 246 (N.D.1994) (same). However, Utah "has joined the national trend" by converting the common-law at-will rule into an evidentiary rebuttable presumption rather than a rule of contract construction. *Retherford v. AT & T Commc'ns*, 844 P.2d 949, 958 (Utah 1992).

¶ 18 Under Utah law, an employment relationship entered into for an indefinite time creates a rebuttable presumption that the employment may be terminated at the will of either the employee or the employer. *See Rackley*, 2001 UT 32 at ¶ 12, 23 P.3d 1022; *see also Uintah Basin Med. Ctr. v. Hardy*, 2002 UT 92, ¶ 21, 54 P.3d 1165 ("[C]ourts in Utah ... adopted the at-will employment rule, under which employment contracts that did not specify a duration were generally presumed to be terminable at will."). This rule "is not, however, a rule of contract construction; it is only a presumption that an employment relationship which has no specified term of duration is an at-will relationship, but that presumption is subject to a number of limitations." *Fox v. MCI Commc'ns Corp.*, 931 P.2d 857, 859 (Utah 1997) (quotations and citations omitted); *accord Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 400 (Utah 1998) ("However, the at-will presumption is only that—a presumption."). The at-will presumption may be rebutted if the employee can show that:

128, 130 (Utah 1987) (applying Utah's at-will presumption to exclusive listing agreement).

8. Some states have adopted an at-will rule that provides that an employment contract is at-will unless the parties agree to a definite term of duration; however, many of those states have tempered the harshness of such a rule by adopting a broad definition of definite duration like that proposed by Klawe. *See, e.g., Schultz v.*

*Hill*, 2002–0835, pp. 5–6 (La.App. 1 Cir. 2/14/03), 840 So.2d 641 (noting that a term is definite if it "is determinable by ... the happening of a future event ... even though the date of the happening of that future event cannot be known until its occurrence"); *Aaland v. Lake Region Grain Coop.*, 511 N.W.2d 244, 246 (N.D.1994) (holding that a term of duration is definite when it "is determinable by an ascertainable event").

(1) there is an implied or express agreement that the employment may be terminated only for cause or upon satisfaction of another agreed-upon condition; (2) a statute or regulation restricts the right of an employer to terminate an employee under certain conditions; or (3) the termination of employment constitutes a violation of a clear and substantial policy.

*Rackley*, 2001 UT 32 at ¶ 13, 23 P.3d 1022 (quotations and citations omitted); *accord Burton v. Exam Ctr. Indus. & Gen. Med. Clinic, Inc.*, 2000 UT 18, ¶ 6, 994 P.2d 1261; *Ryan*, 972 P.2d at 400; *Fox*, 931 P.2d at 859. Thus, under Utah law, an employment contract may be enforced, even to the extent of an indefinite duration, if one of the exceptions is present rebutting the at-will presumption. *See Uintah Basin Med. Ctr.*, 2002 UT 92 at ¶ 22, 54 P.3d 1165 (holding that physician's employment contract, terminable only for cause, was enforceable despite indefinite duration).

¶ 19 We now apply this rebuttable presumption to the facts of the present case viewed in a light most favorable to Klawe. First, we recognize that the exclusive marketing agreement does not specify a duration in the form of expiration on a specific calendar date, nor does it specify expiration after the passage of a defined period of time or upon an event certain to happen. Therefore, assuming, without deciding, that Glacier is correct in characterizing this as a term of indefinite duration, we begin with the presumption that the agreement was terminable at-will. *See id.* ("[U]nder Utah law we initially presume it is of indefinite duration but terminable at will."). This, however, does not end the inquiry. Next, we must "consider whether any of the exceptions to the at-will rule applies." *Id.* Here, the parties expressly agreed[9] that the employment relationship would terminate "upon [the] satisfaction of [an] agreed-upon condition." *Rackley*, 2001 UT 32 at ¶ 13, 23 P.3d 1022

(quotations and citations omitted); *accord Burton*, 2000 UT 18 at ¶ 6, 994 P.2d 1261; *Fox*, 931 P.2d at 859. Specifically, the contract would terminate upon the sale of the last of the forty-two units in the Monte Luca development. This expressly agreed-upon condition, if enforceable, is enough to rebut the presumption that the employment was terminable at will. *See Berube v. Fashion Ctr., Ltd.*, 771 P.2d 1033, 1044 (Utah 1989) (plurality opinion) ("[A]n employee may remove his contract from the at-will category ... by showing an express agreement to a term of employment....").

### B. *Meeting of the Minds*

¶ 20 Implicit in this analysis is an inquiry into whether the agreed-upon condition is definite enough to allow the court to enforce the terms of the condition. This question is distinct from the issue of whether the duration is definite and instead involves principles of contract construction asking whether the parties had a meeting of the minds on the agreed-upon condition.[10] *See Nielsen v. Gold's Gym*, 2003 UT 37, ¶ 11, 78 P.3d 600 ("'[A] meeting of the minds on the integral features of an agreement is essential to the formation of a contract. An agreement cannot be enforced if its terms are indefinite.'" (quoting *Richard Barton Enters. v. Tsern*, 928 P.2d 368, 373 (Utah 1996))); *Valcarce v. Bitters*, 12 Utah 2d 61, 362 P.2d 427, 428 (1961) ("A condition precedent to the enforcement of any contract is that there be a meeting of the minds of the parties, which must be spelled out, either expressly or impliedly, with sufficient definiteness to be enforced.").

¶ 21 Glacier stipulated for the purposes of summary judgment that the parties had agreed to the until-sold term. Nonetheless, Glacier argues that the agreed-upon condition is unenforceable, as a matter

9. Again, we state the facts as stipulated and draw all reasonable inferences in the light most favorable to Klawe for purposes of reviewing the trial court's grant of Glacier's summary judgment motion.

10. Fundamental principles of contract construction still play a role in the analysis because "[a]

wrongful termination case based on a violation of an express or implied term of the employment agreement rests on a duty that an employer voluntarily undertakes as a consequence of the employment agreement itself, whether express or implied." *Fox v. MCI Commc'ns Corp.*, 931 P.2d 857, 860 (Utah 1997).

of law, because the terms of the condition are too indefinite to establish that the parties had a meeting of the minds. First, Glacier contends that it would not have been reasonable for it to have entered into a contract that granted Klawe a perpetual right to sell all the units in Monte Luca. And second, Glacier submits that the agreed-upon condition was indefinite and unenforceable because it would be impossible to determine when the last of the forty-two Monte Luca units would be sold.[11] Nonetheless, when we view all the facts and inferences in a light most favorable to Klawe, as we must, it can be inferred that, at the time of contracting, the parties reached an express agreement under which Klawe had the right to act as the exclusive real estate agent until all forty-two Monte Luca units were sold.[12] In Utah, "[t]he law enables parties to freely contract, establishing terms and allocating risks between them. The law even permits parties to enter into unreasonable contracts or contracts leading to a hardship on one party." *Ryan*, 972 P.2d at 402 (citation omitted). And, "parties to an employment contract may prove in court any express terms of that contract so as to accomplish the agreement's intended purpose." *Berube*, 771 P.2d at 1044. Indeed, Utah courts have enforced perpetual employment contracts terminable only for good cause despite the fact that, at the time of contracting, the parties could not predict if circumstances demonstrating good

cause for termination would ever arise. *See, e.g., Uintah Basin Med. Ctr.*, 2002 UT 92 at ¶ 20 n. 7, 54 P.3d 1165 ("[T]he law in Utah and numerous other jurisdictions recognizes the right of parties to enter into indefinite length contracts terminable for cause.").

¶ 22 Like an agreed-upon just-cause condition, we cannot say that the terms of the until-sold condition were too indefinite to support a meeting of the minds merely because the parties could not predict when the last of the forty-two units would sell. Similarly, we cannot hold that the agreed-upon condition is too indefinite merely because enforcement of the express terms would result in a hardship on Glacier. Under the facts and circumstances present at the time of the agreement, Monte Luca had a defined development plan known to both parties that anticipated forty units. The parties were free to agree that the exclusive agency would terminate upon the sale of all forty of those units. Later, when the parties anticipated the addition of two or three units, they could amend any existing agreement to include those units within the exclusive agency. If the agreement was made, the condition was "set forth with sufficient definiteness that it c[ould] be performed." *Ferris v. Jennings*, 595 P.2d 857, 859 (Utah 1979) (quotations and citations omitted). We therefore reverse the trial court's grant of summary judgment and remand for additional proceedings consistent with this opinion.[13]

11. Glacier presses the argument that because it is a corporate entity existing into perpetuity and because it is impossible to determine if or when it will ever complete the Monte Luca development, the contract with Klawe also extends into perpetuity limited by nothing but the until-sold provision. Glacier overstates this proposition. As a general rule, employment contracts for personal services include an implied condition that the employment relationship terminates upon the death of the employee, thus, the death of Claudia is an additional condition that would also terminate the contract. *See* 14 *Corbin on Contracts* § 75.2, p. 128 (rev. ed. 2001) ("The death of an employee who has contracted to render personal service also discharges the employer from further duty, except the duty to compensate for services already received."); *see also Charles V. Webster Real Estate v. Rickard*, 21 Cal.App.3d 612, 98 Cal.Rptr. 559, 563–64 (1971) ("The owner-broker relationship is a personal one based on mutual confidence.... [Thus, i]n the absence of an expression of intention to the contrary, the

continued life of both reasonably must be deemed an implied condition of the contract. In such a case the death of either renders impossible the performance contemplated and the contract is discharged." (citation omitted)).

12. By holding that the facts, when viewed in a light most favorable to Klawe, could support a determination that a meeting of the minds occurred and that, therefore, the exclusive marketing agreement could only be terminated upon the sale of the last unit, we do not intend to resolve any contractual issues that may arise upon the actual resolution of the disputed facts. Rather, we hold only that Klawe is entitled to submit its interpretation to the trier of fact.

13. This holding is very narrow and only addresses whether Klawe's breach of contract claim was properly disposed of on summary judgment on the ground that it was an at-will contract as a matter of law. Our decision today is limited to a review of whether, under Utah's at-will presump-

## II.  Evidentiary Issues

### A.  *Altercation Between Claudia and Gough*

¶ 23  Klawe also asks this court to review the trial court's exclusion, under rule 403 of the Utah Rules of Evidence, of Claudia's testimony regarding the altercation she had with Gough when he contested Klawe's right to receive a commission on the unit Gough purchased in Monte Luca. Klawe does not, however, assert that exclusion of the evidence was in error.  Klawe concedes that testimony regarding the altercation was properly excluded as it pertained to the unjust enrichment and fraud claims before the jury.  Instead, Klawe asks this court to rule that Claudia must be permitted to testify on the subject of her altercation with Gough during the trial after remand of Klawe's breach of contract claim.  Klawe reasons that Glacier is likely to assert that Klawe was the first to breach the exclusive marketing agreement when it assigned Claudia's duties to another agent.  Klawe asserts that testimony regarding the altercation between Claudia and Gough will be highly probative of the reasons underlying the assignment. Klawe contends that, when the evidence is viewed in the context of the breach of contract claim instead of the unjust enrichment claim, the testimony regarding the altercation cannot be substantially outweighed by the prejudicial value of the evidence as a matter of law.  Therefore, Klawe urges this court to remove the evidentiary decision-making from the trial court and to direct that Claudia be allowed to testify on the subject of the altercation on remand.  This we will not do.

¶ 24  " '[A] trial court has broad discretion to determine whether proffered evidence is relevant' " under rule 401 of the Utah Rules of Evidence.  *State v. Hobbs*, 2003 UT App 27, ¶¶ 11, 26, 64 P.3d 1218 (alteration in original) (quoting *State v. Kohl*, 2000 UT 35, ¶ 17, 999 P.2d 7).  Similarly, the trial court is granted broad discretion when weighing the probative value of evidence against the reasons for exclusion enumerated in rule 403.  *See State v. Bluff*, 2002 UT 66, ¶ 56, 52 P.3d 1210 ("[A] trial court's ruling under rule 403 is also reviewed for abuse of discretion."); *State v. Pena*, 869 P.2d 932, 937–38 (Utah 1994) (noting that "a spectrum of discretion" exists and "toward the broad end of the spectrum is the decision to admit or exclude evidence under Utah Rule of Evidence 403").  Furthermore, the trial court is in the best position to make evidentiary rulings as they arise because it can review, among other things, the claims and the evidence already admitted or proffered.  *See Whitehead v. American Motors Sales Corp.*, 801 P.2d 920, 923 (Utah 1990) (noting the "trial court's advantageous position" in "reviewing questions of admissibility of evidence at trial"); *Shipp v. General Motors Corp.*, 750 F.2d 418, 427 (5th Cir.1985) (noting that evidentiary determinations under the identically worded rule 403 of the Federal Rules of Evidence "are often inextricably bound with the facts of a particular case").

¶ 25  Although we acknowledge the likely relevance of Gough's alleged threatening behavior to the breach of contract claim and Glacier's relevant defenses, we nonetheless stop short of usurping the trial court's primary responsibility to make the rule 403 determination on remand.  *See Bullock v. Ungricht*, 538 P.2d 190, 192 (Utah 1975) (noting that rulings on evidence are "primarily the responsibility of the trial judge").  The admissibility of relevant evidence is not without limit.  *See id.*  Rule 403, for example, "permits the exclusion of otherwise relevant evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.' "  *Hobbs*, 2003 UT App 27 at ¶ 27, 64 P.3d 1218 (quoting Utah R. Evid. 403).  If, on remand, Glacier objects to the admission of Claudia's testimony regarding her altercation with Gough, the trial court is uniquely situated to reweigh the probative value of the proffered evidence

---

tion, the "evidence, admissions, and inferences ... when viewed in the light most favorable to [Klawe] establish that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' "  *Rose v. Allied Dev. Co.*, 719 P.2d 83, 84 (Utah 1986) (quoting Utah R. Civ. P. 56(c)).

against its potential for unfair prejudice in the context of the claims and defenses at issue.

### B. *Pretrial Disclosures*

¶ 26 Klawe argues that the trial court erred when it announced that "it just goes without saying that rebuttal witnesses do not have to be disclosed in initial disclosures," and allowed Marchant to testify that Coldwell would not have accepted an until-sold listing. Klawe argues that because Marchant was not disclosed as a witness in Glacier's pretrial disclosures as required by rule 26(a)(4) of the Utah Rules of Civil Procedure, Marchant should have been barred from testifying under rule 37(f). *See* Utah R. Civ. P. 26(a)(4), 37(f). Glacier responds that Marchant's testimony was offered solely for the purpose of impeaching Claudia and that sanctions are inapplicable because Marchant's testimony was properly allowed under the "solely for impeachment" exception to the disclosure requirements. *See id.* 26(a)(4). Klawe claims that it would have been impossible to "impeach" Claudia's testimony that *she believed* that Coldwell would have accepted an until-sold listing[14] with testimony from Marchant that *he believed* otherwise. Additionally, Klawe maintains that Marchant's testimony addressed an area of substantive import to the remaining unjust enrichment and fraud claims because the testimony suggested that Klawe's reliance on the until-sold agreement was not reasonable.

¶ 27 Rule 26 of the Utah Rules of Civil Procedure requires litigants to make certain pretrial disclosures. *See* Utah R. Civ. P. 26(a)(4). Specifically, rule 26 mandates that parties provide each other with "the name[,] ... address[,] and telephone number of each witness, separately identifying witnesses the party expects to present and witnesses the party may call if the need arises." *Id.* 26(a)(4)(A). Additionally, parties are charged with a duty to supplement pretrial disclosures "if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties."[15] *Id.* 26(e)(1). However, the rule is not absolute. A party need not identify a witness in its pretrial disclosures if the witness is offered "solely for impeachment." *Id.* 26(a)(4). Glacier argues that it had no duty to disclose Marchant as a witness because Marchant's testimony was used solely for the purpose of impeaching Claudia.

¶ 28 The scope of the "solely for impeachment" exception to rule 26 disclosures under the Utah Rules of Civil Procedure is a question of first impression for Utah courts. We begin by noting that there is a strong policy underlying the modern rules of civil procedure that the "instruments of discovery ... together with pretrial procedures make a trial less a game of blindman's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958); *see also Roundy v. Staley*, 1999 UT App 229, ¶ 11, 984 P.2d 404 (plurality opinion) ("[T]he purpose of Utah's discovery rules [is to] facilitat[e] fair trials with full disclosure of all relevant testimony and evidence.").

¶ 29 Rule 26(a)(4) states: "A party shall provide to other parties the following information regarding the evidence that it may present at trial other than *solely for impeachment.*" Utah R. Civ. P. 26(a)(4) (emphasis added). Impeachment of a witness is defined as the act of "discredit[ing] the veracity of a witness." *Black's Law Dictionary* 768 (8th ed.1999) (parentheses omitted). Similarly, "impeachment evidence" is defined as "[e]vidence used to undermine a witness's credibility." *Id.* at 597. Thus, by the rule's plain meaning, witnesses need not be disclosed if the sole purpose of their testimony

---

**14.** During cross-examination, Glacier's counsel elicited testimony from Claudia as follows: "Glacier Counsel: 'Do you *believe* Coldwell Banker would have accepted an until-sold listing agreement as of about August of 1999? Yes or no.'" (Emphasis added.) "Claudia Klawe: 'Yes.'"

**15.** There is no dispute that Glacier was aware, sometime prior to trial, that Marchant was prepared to testify that he believed Coldwell would not accept until-sold listing agreements.

is to call into question the "veracity" or "credibility" of another witness.

¶ 30 The text of rule 26(a)(3) of the Federal Rules of Civil Procedure governing pretrial disclosures is nearly identical to that of rule 26(a)(4) of the Utah Rules of Civil Procedure. *Compare* Fed.R.Civ.P. 26(a)(3), *with* Utah R. Civ. P. 26(a)(4). Because "[i]nterpretations of the Federal Rules of Civil Procedure are persuasive where the Utah Rules of Civil Procedure are 'substantially similar' to the federal rules," *Tucker v. State Farm Mut. Auto. Ins. Co.*, 2002 UT 54, ¶ 7 n. 2, 53 P.3d 947 (citation omitted), we next survey the federal treatment of the phrase "solely for impeachment" within the context of rule 26(a)(3) of the federal rules. The advisory committee's notes to the 1993 amendments to the Federal Rules of Civil Procedure explain that "[b]y its terms, rule 26(a)(3) does not require disclosure of evidence to be used solely for impeachment purposes." Fed. R.Civ.P. 26 advisory committee's note to the 1993 amendments. However, the advisory committee's notes also explain that rule 26(a)(3)(A) "requires the parties to designate the persons whose testimony they may present as *substantive evidence* at trial." *Id.* (emphasis added). Thus, the advisory committee's notes raise the inference that there is a distinction between evidence that is "solely for impeachment" which need not be disclosed, and evidence that has a "substantive" value which must be disclosed. *See id.*

¶ 31 Federal circuit courts of appeal have split over the meaning of rule 26's solely for impeachment exception. Some circuits have applied a narrow interpretation of the phrase solely for impeachment, holding that evidence having both an impeachment purpose and a substantive purpose "is not offered 'solely for impeachment,' [and] it is not covered by the exception to the [r]ule 26 discovery requirements." *Klonoski v. Mahlab*, 156 F.3d 255, 270 (1st Cir.1998) ("The excerpts from the letters written by Mrs. Klo-

noski to her sister were at least in part substantive, and therefore they did not fall within the 'solely for impeachment' exception ....."); *see also Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513, 517–18 (5th Cir.1993) ("Because the tape is, at the very least in part substantive, it should have been disclosed prior to trial, regardless of its impeachment value."). Under that interpretation, a witness's testimony is offered solely for impeachment if its only purpose is to "discredit a witness[, or] to reduce the effectiveness of her testimony by bringing forth evidence which explains why the jury should not put faith in [his] or her testimony." *Chiasson*, 988 F.2d at 517 (quotations, citation, alteration, and omission omitted). Alternatively, some circuits have rejected the impeachment versus substantive evidence dichotomy and have instead relied more heavily on the subjective intentions of the party in offering the evidence. *See DeBiasio v. Illinois Cent. R.R.*, 52 F.3d 678, 686 (7th Cir. 1995) (determining that witness's testimony having both impeachment and substantive characteristics was solely for impeachment because the defendant's primary purpose in offering the testimony was for impeachment and not to prove or disprove an element of the plaintiff's claim); *Jeffries v. Pacific Indem. Co.*, No. 97–1398, 1997 WL 774459 at *2–3, 131 F.3d 134, 1997 U.S. App LEXIS 35513 at *6–7 (4th Cir. Dec. 17, 1997) (unpublished) (per curiam) (finding exhibits were solely for impeachment because they were offered to contradict plaintiff's testimony that she owned property, even where exhibits had substantive value because ownership of the property was one of the elements of plaintiff's claim).

¶ 32 Utah has not yet decided whether the "solely for impeachment" language of rule 26 means that evidence must have, as its only purpose, the ability to shed light on a witness's veracity.[16] For the pur-

---

**16.** The Utah Supreme Court has previously discussed when evidence is used "solely for impeachment purposes" within the context of Utah's Post–Conviction Remedies Act (the Act), Utah Code Ann. §§ 78–35a–101 to –110 (2002 & Supp.2006). *See Wickham v. Galetka*, 2002 UT 72, ¶¶ 13–14, 61 P.3d 978; *Julian v. State*, 2002

UT 61, ¶ 20, 52 P.3d 1168. "Under the Act, a person who has been convicted and sentenced for a criminal offense may file a civil action for post-conviction relief to vacate or modify the conviction or sentence" based on the discovery of new evidence. *Wickham*, 2002 UT 72 at ¶ 9, 61 P.3d 978. However, the Act does not provide

poses of this case, that issue need not be decided. Even if we were to assume that Utah will adopt the more narrow interpretation of the "solely for impeachment" exception and that Marchant's testimony was substantively relevant rather than solely for the purpose of discrediting Claudia's veracity, we are not persuaded that the trial court committed prejudicial error.

¶ 33 Klawe argues that it was reversible error for the trial court to deny its motion to exclude Marchant's testimony as a sanction under rule 37(f). Again, assuming, without deciding, that the admission of Marchant's testimony was improper, Klawe has failed to demonstrate that the admission of the evidence was "harmful." *State v. Lindgren*, 910 P.2d 1268, 1271 (Utah Ct.App.1996); *see also Stevenett v. Wal–Mart Stores, Inc.*, 1999 UT App 80, ¶ 8, 977 P.2d 508 ("[T]he person asserting error has the burden to show not only that the error occurred but also that it was substantial and prejudicial."). In other words, Klawe has not shown that "absent the error there [wa]s a reasonable likelihood of an outcome more favorable." *Lindgren*, 910 P.2d at 1271 (quotations and citation omitted).

¶ 34 We note that "[t]he determination of whether there is a reasonable likelihood of a more favorable outcome is based upon a review of the record." *Id.* at 1274. "This review requires the appellate court to determine from the record what evidence would have been before the jury absent the trial court's error." *Id.* "When evidence is erroneously admitted, it is possible for a reviewing court to excise the offending evidence and evaluate the remaining uncontested evidence so as to determine whether the properly admitted evidence is such that the prevailing party would have prevailed anyway." *Berrett v. Denver & Rio Grande W. R.R. Co.*, 830 P.2d 291, 297 n. 10 (Utah Ct.App.1992). Here, the record reveals that the trial consumed five full days, of which Marchant's testimony comprised a mere five-minute fraction. Marchant testified only that he was the principal broker for Coldwell,

that he had never seen the until-sold listing agreements for Monte Luca, and that he did not believe that Coldwell would have accepted the until-sold agreements. Given the short duration of Marchant's testimony, as well as the fact that he only testified that he "believed" that Coldwell would not have accepted the agreement, we are not persuaded that, in the absence of Marchant's testimony, Klawe had a "reasonable likelihood of an outcome more favorable" on either its unjust enrichment claim or its fraud claim. *Lindgren*, 910 P.2d at 1271. Therefore, we reject Klawe's argument that the trial court committed reversible error.

¶ 35 Klawe also argues that in the event its breach of contract claim is remanded, this court should direct the trial court to exclude Marchant's testimony on any subsequent trial of that issue. Again, we refuse to invade the role of the trial court to make evidentiary rulings on remand. "Trial courts have broad discretion in determining discovery sanctions 'because trial courts must deal first hand with the parties and the discovery process.'" *Hales v. Oldroyd*, 2000 UT App 75, ¶ 15, 999 P.2d 588 (quoting *Utah Dep't of Transp. v. Osguthorpe*, 892 P.2d 4, 6 (Utah 1995)). One of the primary goals of the discovery process is "to remove elements of surprise or trickery so the parties and the court can determine the facts and resolve the issues as directly, fairly, and expeditiously as possible." *Ellis v. Gilbert*, 19 Utah 2d 189, 429 P.2d 39, 40 (1967). The trial court is in the best position to assess any unfair surprise or prejudice that may remain if Marchant is called to testify on remand.

### III. Attorney Fees

¶ 36 Finally, Glacier appeals the trial court's ruling that Glacier waived its right to recover attorney fees by failure to timely file. In *Meadowbrook, L.L.C. v. Flower*, 959 P.2d 115 (Utah 1998), the Utah Supreme Court announced a "clear rule" when addressing the precise issue present here—"whether a prevailing party waives its right to attorney fees if it fails to present evidence of attorney

relief if the newly discovered evidence is "merely impeachment evidence." Utah Code Ann. § 78–

35a–104(1)(e)(iii).

fees or move the court during trial to allow evidence of such fees to be presented after trial." *Id.* at 117, 119. In *Meadowbrook*, the supreme court clarified that a motion for attorney fees must be made during the "trial phase" of the case, *see id.* at 117, and that "the 'trial phase' ends ... with the signed entry of final judgment or order, at which time trial issues become ripe for appeal," *id.* at 119. The *Meadowbrook* court went on to note that "[a]bsent a rule or statutory provision to the contrary, the rule ... prevents a party from bringing a post-judgment motion for attorney fees."[17] *Id.* at 119. In the instant case, Glacier's motion for attorney fees was filed thirty-five days after the entry of final judgment and nineteen days after the entry of the amended judgment, which also disposed of all post-trial motions. Additionally, Glacier has failed to identify an applicable "rule or statutory provision" that would allow a post-judgment motion for attorney fees in this case. *Id.* Therefore, under *Meadowbrook*, Glacier waived its rights to fees and we affirm the trial court's denial of the motion for attorney fees.

¶ 37 Klawe also seeks attorney fees on appeal pursuant to Utah Rules of Appellate Procedure 33 and 40. *See* Utah R.App. P. 33, 40. We deny the request.

## CONCLUSION

¶ 38 Under Utah law, employment contracts of indefinite duration are subject to an at-will presumption that can be rebutted by, among other things, evidence of an implied or express agreement that the employment could only be terminated upon satisfaction of an agreed-upon condition. When all facts and inferences are viewed in a light most favorable to Klawe, summary judgment was improperly granted because those facts could support a finding that the parties reached an express agreement that the exclusive listing

agreement would terminate upon the happening of an agreed-upon condition—the sale of all the units in the Monte Luca development. Next, even if we assume that Marchant's testimony did not fall within the "solely for impeachment" exception to the pretrial disclosure requirements of rule 26 of the Utah Rules of Civil Procedure, we hold that the trial court did not commit reversible error because Klawe failed to demonstrate harm. Additionally, we decline Klawe's invitation to require the trial court to allow Claudia's testimony regarding her altercation with Gough or to exclude Marchant's testimony on remand. Finally, we affirm the trial court's determination that Glacier waived its right to attorney fees as the prevailing party and deny Klawe's motion for attorney fees incurred in this appeal. Accordingly, we affirm in part and reverse and remand in part for further proceedings consistent with this decision.

¶ 39 WE CONCUR: RUSSELL W. BENCH, Presiding Judge and PAMELA T. GREENWOOD, Associate Presiding Judge.

---

17. Glacier argues that *ProMax Development Corp. v. Raile*, 2000 UT 4, 998 P.2d 254, casts doubt on the rules regarding timing of motions for attorney fees as set forth in *Meadowbrook, L.L.C. v. Flower*, 959 P.2d 115 (Utah 1998). In *ProMax*, the Utah Supreme Court held that "a trial court must determine the amount of attorney fees awardable to a party before the judgment becomes final for purposes of an appeal." 2000 UT 4 at ¶ 15, 998 P.2d 254. However, *ProMax* is not in conflict with *Meadowbrook* because *ProMax*

presupposes that the parties had filed their motions for attorney fees before final judgment was entered on all other matters before the court. Therefore, if a party moves for attorney fees before entry of a final and appealable judgment or order, *see Meadowbrook*, 959 P.2d at 117, it becomes a pending matter before the trial court that must be resolved before any subsequent judgment or order can become final and appealable under Utah Rule of Appellate Procedure 3, *see ProMax*, 2000 UT 4 at ¶ 15, 998 P.2d 254.