2015 UT App 119

## THE UTAH COURT OF APPEALS

DAVID A. FRANCIS,
Plaintiff, Appellee, and Cross-appellant,
*v.*
NATIONAL DME, JOSEPH COTTIS, AND J. SCOTT COTTIS,
Defendants, Appellants, and Cross-appellees.

Opinion
No. 20120605-CA
Filed May 7, 2015

Third District Court, Salt Lake Department
The Honorable L.A. Dever
No. 090912839

Gary R. Guelker and Janet I. Jenson, Attorneys
for Appellants

April L. Hollingsworth and Elizabeth M. Peck,
Attorneys for Appellee

JUDGE STEPHEN L. ROTH authored this Opinion, in which
JUDGE JAMES Z. DAVIS and SENIOR JUDGE RUSSELL W. BENCH
concurred.[1]

ROTH, Judge:

¶1      In this employment dispute, National DME, Joseph Cottis, and J. Scott Cottis (collectively, DME) seek appellate review of various rulings made by the trial court. Specifically, DME seeks reversal of the trial court's decisions to deny its motion for a new trial or, alternatively, to reduce the judgment to $9,700; to exclude certain evidence as unduly prejudicial under rule 403 of

---

1. The Honorable Russell W. Bench, Senior Judge, sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

the Utah Rules of Evidence; and to award attorney fees and prejudgment interest at the rate of 10% to the plaintiff, David A. Francis. Francis cross-appeals, arguing that the trial court erred by entering a directed verdict that dismissed his counterclaim for intentional interference with economic relations and by denying on hearsay grounds the admission of certain evidence relevant to that counterclaim.

¶2     With respect to the issues raised by DME, we reverse the trial court's decision to deny DME's motion to amend the judgment and we reduce the judgment to $9,700. This decision means that we must vacate the award of statutory attorney fees. We affirm, however, the trial court's award of prejudgment interest and its decision to exclude evidence regarding the circumstances of DME's termination of Francis. With respect to the issues raised by Francis on cross-appeal, we affirm the trial court's ruling regarding the exclusion of certain evidence on hearsay grounds, but we reverse the trial court's ruling as to his counterclaim for intentional interference with economic relations and remand for further proceedings.

BACKGROUND

I. Francis's Employment at DME

¶3     DME is a Utah company that sells durable medical equipment such as canes, crutches, splints, wheelchairs, custom braces, sleep therapy oxygen devices, and other breathing equipment. DME sells its products in three ways: an inventory outsourcing program, direct sales to patients, and sales through a website. DME maintains two branches that are responsible for distributing its products, regardless of how they are sold: the Salt Lake branch and the St. George branch.

¶4     DME hired Francis as its national sales manager on April 1, 2003. As part of the hiring process, DME provided Francis

with an employee handbook. Francis acknowledged receipt of the handbook by signing an "Acknowledgement Form." Although the Acknowledgement Form does not reference a noncompete agreement, DME's president testified at trial that a noncompete agreement form was included as part of the handbook and that Francis agreed to be bound by the noncompete agreement by signing the Acknowledgement Form. Francis denied that he had ever seen, been presented with, or signed a noncompete agreement.

¶5    DME terminated Francis's employment one year later after Francis failed to report to work for three consecutive days. Shortly thereafter, Francis began work at a similar company, BSN Medical, as an independent sales representative. After starting work at BSN, Francis filed a wage claim against DME with the Utah Labor Commission (the Commission) to recover unpaid commissions. The Commission notified DME of the wage claim on June 15, 2004.

¶6    In the meantime, DME learned that Francis had begun working for BSN. According to DME, it believed that Francis was bound by a noncompete agreement and therefore instructed its attorney to send Francis a letter alleging that his employment at BSN was "in direct violation" of that agreement. The letter threatened legal action if Francis did not "terminate [his] employment with BSN Medical immediately and provide evidence satisfactory to National DME" that he had ceased competing with it. The letter to Francis was dated June 17, 2004, and was copied to BSN.

¶7    After receiving DME's letter, BSN contacted Francis about the alleged noncompete agreement. Francis denied ever signing or agreeing to a noncompete agreement and voiced his belief that the June 17 letter was written in retaliation for his wage claim. On July 14, 2004, BSN formally responded to DME's June 17 letter with a letter of its own to DME, indicating that it had tried unsuccessfully to contact DME's attorney "to discuss

[DME's] concerns and the background and documents relating to" Francis's alleged noncompete agreement. Over a month passed without a response from either DME or DME's attorney.

¶8 The next communication Francis received regarding the noncompete issue was a voicemail left by Francis's BSN supervisor on August 11, 2004. According to Francis, the supervisor informed him that "because we're going to an employee/employer relationship," as opposed to having the sales representatives work as independent contractors, "human resources feels like the noncompete agreement precludes my being able to keep you in your territory." (Emphasis omitted.) The next day, BSN sent Francis a formal termination letter via email.

¶9 A week later, on August 19, 2004, DME sent a letter to Francis's BSN supervisor stating that DME had "reached a 'settlement' agreement with Dave Francis regarding his employment with BSN" and that DME would not pursue enforcement of the noncompete agreement. By this time, however, BSN had already terminated Francis. Nevertheless, the BSN supervisor forwarded DME's August 19 letter to another BSN representative, stating that "this should close the Dave Francis issue."

## II. Procedural History

¶10 After leaving BSN, Francis continued to pursue his wage claim against DME. On April 6, 2005, he sent a demand letter to DME setting forth a number of claims under federal and state law and offering to settle all of them for $150,000. He specifically addressed the wage claim, stating that DME "still owes Mr. Francis approximately $15,000 in commissions that were owed to him for sales he made while still employed with the company." The parties were unable to settle the matter, and Francis filed suit against DME and certain individuals associated with DME in federal district court.

¶11 In his complaint, Francis set out federal claims under the Americans with Disabilities Act of 1990, the Consolidated Omnibus Budget Reconciliation Act, the Employee Retirement Income Security Act, and the Family Medical Leave Act of 1993. Additionally, Francis alleged several state-law claims, including intentional interference with economic relations, equitable estoppel, and breach of contract. He also requested attorney fees.

¶12 DME moved for summary judgment on Francis's claims, and the federal district court granted it in part, dismissing all of Francis's federal claims and his equitable estoppel claim, leaving only his claims for intentional interference with economic relations and breach of contract and his request for attorney fees. The federal court declined to exercise supplemental jurisdiction over the remaining claims and instead dismissed them without prejudice, informing Francis that he was free to refile in state court.

¶13 Francis did so on August 5, 2009. Due to the extensive discovery that had already occurred in federal court, the parties agreed to proceed immediately to trial. Several motions in limine were filed ahead of trial, two of which are pertinent to this appeal. In the first, Francis moved to exclude any evidence regarding the circumstances of DME's termination of his employment. The trial court granted the motion, reasoning that the evidence regarding his termination was not relevant and that, even if relevant, it would be substantially more prejudicial than probative under rule 403 of the Utah Rules of Evidence. In the second motion, DME moved to exclude evidence of the voicemail that BSN left for Francis, arguing that Francis's testimony concerning the voicemail would be inadmissible hearsay. The trial court agreed and granted the motion.

¶14 At trial, the parties sharply contested the terms of Francis's employment contract with DME. First, Francis testified that in addition to his salary of $60,000 per year plus benefits (which had been paid), DME promised him commissions equal

to 4% of the Salt Lake branch's net profits (excluding any profits from oxygen sales). He further testified that DME's president had expressly acknowledged that Francis had earned $15,000 in commissions for the first quarter of his employment. Francis admitted that DME had paid him $5,300 of that amount, $2,300 to cover repairs he had incurred on his truck and another $3,000 to fund Christmas bonuses to DME warehouse employees under Francis's supervision.

¶15    DME responded with testimony that it had never agreed to pay Francis commissions in addition to salary and it had never acknowledged owing him $15,000 in commissions for the first quarter of his employment or otherwise. DME did admit, however, that during the final three months of Francis's employment, it had paid him $2,300[2] in addition to his salary and that the W-2 form it had issued to Francis reflected that fact. Francis then testified that the $2,300 represented a portion of the $15,000 he was owed for his commissions, namely the portion he was given in order to repair his truck.

¶16    Other than his own testimony regarding commissions owed for the first quarter of his employment, Francis did not offer any specific evidence about the amount of commissions he had earned during the time he was employed at DME. That is, he did not offer any specific evidence regarding the net profits of the Salt Lake branch between April 2003 and March 2004. Instead, he elicited testimony from DME's executives that its net profits company-wide for 2003 and 2004 were $600,000 and that the company's sales remained steady during that time period.

---

2. There was a discrepancy about whether the amount was $2,300 or $2,500. At one point in the trial, Francis seemed to concede that DME had actually paid $2,500. Because DME has indicated its willingness to be bound by the $2,300 figure, we will use it throughout this decision.

¶17    At the close of Francis's case-in-chief, DME moved for a directed verdict on Francis's claim for intentional interference with economic relations, arguing that he had failed to establish causation. The trial court agreed and dismissed the claim. At the same time, DME moved for a directed verdict on DME's alleged breach of Francis's employment contract, arguing that Francis had failed to establish damages. Specifically, DME argued that because there was no evidence of the net profits for the Salt Lake branch, Francis could not prove damages with reasonable certainty. Initially, the trial court agreed to limit the question of damages to the $9,700 that Francis claimed he was still owed for the first quarter of his employment. Prior to closing arguments and at the request of Francis's counsel, however, the trial court revisited this ruling. It ultimately accepted Francis's argument that because there was testimony about DME's net profits during 2003 and 2004 (the years that encompassed Francis's year of employment with DME) and there was also testimony that the company's sales remained steady during that time, the jury could "extrapolate" from those facts that Francis's commissions also would have remained steady. Based on this reasoning, the court reversed its prior ruling and allowed Francis to present this extrapolation argument to the jury during closing arguments.

¶18    The jury found for Francis on the breach of contract claim and awarded him $24,000 for unpaid commissions. The trial court subsequently awarded Francis $46,870.07 for attorney fees pursuant to Utah Code section 34-27-1 and prejudgment interest on the $24,000 from April 1, 2004, to June 25, 2010, at a statutory rate of 10% under Utah Code section 15-1-1. DME then moved for a new trial or, alternatively, to reduce the amount of the judgment, arguing that there was insufficient evidence to support the jury's verdict. The court denied this motion, reasoning that the jury's award was "well within the realm of a reasonable award." Final judgment was entered, and both parties filed timely appeals.

ISSUES AND STANDARDS OF REVIEW

¶19     DME raises four issues in its appeal. First, it argues that there was insufficient evidence to support the jury's verdict. When a party challenges a verdict based on insufficiency of the evidence, "[w]e reverse only if, viewing the evidence in the light most favorable to the prevailing party, we conclude that the evidence is insufficient to support the verdict." *Scudder v. Kennecott Copper Corp.*, 886 P.2d 48, 52 (Utah 1994) (citation and internal quotation marks omitted).

¶20     Second, DME argues that the trial court should have allowed it to present evidence regarding the circumstances surrounding Francis's termination. "Trial court rulings on the admissibility of evidence generally entail a good deal of discretion, and we review those rulings for an abuse of that discretion." *State v. Havatone*, 2008 UT App 133, ¶ 6, 183 P.3d 257 (citation and internal quotation marks omitted).

¶21     The third and fourth issues raised by DME involve the trial court's interpretation and application of two statutes. Specifically, DME argues that the trial court misinterpreted sections 34-27-1 and 15-1-1 of the Utah Code when it awarded Francis his attorney fees and prejudgment interest. "When our review requires us to examine statutory language, we look first to the plain meaning of the statute and then review [the] district court's interpretation of a statute for correctness." *State v. Steed*, 2014 UT 16, ¶ 14, 325 P.3d 87 (alteration in original) (citations and internal quotation marks omitted).

¶22     In his cross-appeal, Francis raises two issues. First, he argues that the trial court erred when it granted DME's motion for a directed verdict with respect to his claim for intentional interference with economic relations and that it erred again when it refused to reconsider its ruling on that claim later in the trial. We review the trial court's "grant or denial of a motion for directed verdict for correctness." *Proctor v. Costco Wholesale Corp.*,

2013 UT App 226, ¶ 6, 311 P.3d 564. "Accordingly, we will sustain a directed verdict if[,] after examining all evidence in a light most favorable to the non-moving party, there is no competent evidence that would support a verdict in the non-moving party's favor." *Id.* (alteration in original) (citation and internal quotation marks omitted).

¶23    Second, Francis argues that the trial court erroneously excluded his testimony about the voicemail left by BSN as inadmissible hearsay. "The determination of whether evidence constitutes hearsay is a question of law that we review for correctness." *Stepsaver, Inc., v. Department of Workforce Servs.*, 2013 UT App 207, ¶ 8, 309 P.3d 290 (citation and internal quotation marks omitted). We review "the ultimate ruling on admissibility," however, for "an abuse of discretion." *State v. Stewart*, 2014 UT App 112, ¶ 7, 327 P.3d 595 (citation and internal quotation marks omitted).


ANALYSIS

I. DME's Appeal

A.    The Trial Court Erred by Denying DME's Motion for a Reduction in Judgment Because the Evidence Was Sufficient Only to Support a Verdict of $9,700.

¶24    DME argues that the trial court should have granted either its motion for a new trial or its motion to amend the judgment amount because there was insufficient evidence to support the jury's $24,000 verdict, even under Francis's extrapolation theory. *See* Utah R. Civ. P. 59(a), (b), (e) (explaining that a party may move for a new trial or seek to alter or amend a judgment when the evidence is insufficient to support the verdict). Specifically, DME argues that Francis presented no evidence regarding the net profits of the Salt Lake branch and, because those profits cannot be determined based solely on the

net profits of the company as a whole, there was no way for the jury to reliably decide how much, if anything, Francis was owed in commissions. Hence, DME urges us to conclude that the jury's verdict was based upon speculation and was therefore unsupported by the evidence. We agree that there was insufficient evidence to support an award greater than $9,700.

¶25    DME relies on *Price–Orem Investment Co. v. Rollins, Brown & Gunnell, Inc.*, 784 P.2d 475 (Utah Ct. App. 1989), to support its contention that Francis had not sufficiently proven $24,000 in damages. *Price–Orem* states that a plaintiff must demonstrate the amount of damages suffered with "reasonable certainty." *Id.* at 478, *overruled on other grounds by Smith v. Fairfax Realty, Inc.*, 2003 UT 41, 82 P.3d 1064. DME argues that Francis failed to meet this burden because he failed to "provide supporting evidence of overhead expenses and other costs of producing income from which a net income figure can be derived," *see id.* at 479, and that therefore the jury's verdict was "necessarily . . . based on speculation."

¶26    *Price–Orem* establishes the standards for proving both the *fact* of damages and the *amount* of damages, recognizing that "the level of certainty required to establish the amount of loss is generally lower than that required to establish the fact of loss." *Id.* To prove the fact of damages, "[t]he evidence must do more than merely give rise to speculation that damages in fact occurred; it must give rise to a reasonable probability that the plaintiff suffered damage as result of a breach." *Atkin Wright & Miles v. Mountain States Tel. & Tel. Co.*, 709 P.2d 330, 336 (Utah 1985). Proving the amount of damages does not require "absolute precision." *Price–Orem*, 784 P.2d at 478. Instead, "[t]he certainty requirement is met as to the amount of lost profits if there is sufficient evidence to enable the trier of fact to make a reasonable approximation." *Cook Assocs., Inc. v. Warnick*, 664 P.2d 1161, 1167 (Utah 1983). But "[w]hat constitutes such an approximation will vary with the circumstances. Greater

accuracy is required in cases where highly probative evidence is easy to obtain than in cases where such evidence is unavailable." *Id.*

¶27    In this case, Francis provided sufficient evidence for a jury to reasonably conclude that DME failed to pay him commissions that were part of his compensation structure. For instance, though DME denied it, Francis testified that DME had agreed to pay him a commission of 4% of the Salt Lake branch's net profits (excluding oxygen sales) and that the company then had refused to pay him all the commissions that he was owed. And Francis also provided a W-2 form showing that DME had made an additional payment beyond what Francis was owed in salary during that period. Although DME had no explanation for the discrepancy, Francis testified that the additional payment was a portion of the commissions he was owed and that it was paid to him in order to get his truck repaired. Thus, there was sufficient evidence before the jury for it to conclude that there was a "reasonable probability" that DME had breached its employment contract with Francis and that Francis had suffered damages as a result of that breach. *See Atkin Wright & Miles*, 709 P.2d at 336.

¶28    We are not persuaded, however, that Francis put on evidence sufficient to sustain a damages award of $24,000. Though "[t]he amount of damages may be based upon approximations," those approximations must be "based upon reasonable assumptions or projections." *Price–Orem*, 784 P.2d at 479 (alteration in original) (citation and internal quotation marks omitted). And a reasonable approximation in this case requires some "[g]reater accuracy" because "highly probative evidence [of the amount of damages] is easy to obtain." *Cook Assocs.*, 664 P.2d at 1167. This is because unlike cases such as *Price–Orem*, where the plaintiff claimed damages based on the loss of unrealized (and unrealizable) *future* events, Francis claimed loss of commissions owed for profits *already* made, a matter much

more susceptible to historic analysis. As a consequence, something more tangible in the way of "approximation" was both required and available in this case than what Francis presented. *See Cook Assocs.*, 664 P.2d at 1167.

¶29   Francis failed to provide the evidence necessary to support the $24,000 award. Although he worked for DME for about one year, he provided specific testimony only about the first quarter of his employment at DME, stating that DME had acknowledged owing him $15,000 in commissions for that period. And despite his claim that DME's agreement was to pay him commissions in the amount of 4% of the Salt Lake branch's net profits less oxygen sales, he provided no direct evidence of those profits for the subsequent three quarters of the year that he managed that branch or the amount of commission he should have earned in that period. Francis offers no explanation for why specific information about the net profits earned by his branch would not have been available, either from his own personal knowledge as branch manager or from sources within DME itself.

¶30   Francis contends, however, that the $24,000 damages award is nevertheless supported by the evidence under the extrapolation theory the trial court allowed him to argue to the jury in closing. Francis urged the jury to infer the amount of commissions DME owed him by extrapolating his first quarter commissions ($15,000) over the entire year, based on DME testimony that profits and sales for the company as a whole had remained steady during the relevant time frame. According to Francis, using this method, the jury could reasonably have concluded that he would have earned $60,000 in commissions during the entire year. And because this theory supported a higher award, a $24,000 damages award was justified. Indeed, Francis contends, the $24,000 award is appropriate because $24,000 is exactly 4% of the company's net sales of $600,000. But even viewing the evidence in the light most favorable to Francis,

the evidence simply does not support Francis's claim that he could be imputed the $24,000 awarded, much less the $60,000 he argued could have been awarded. *See Wilson Supply, Inc. v. Fradan Mfg. Corp.*, 2002 UT 94, ¶ 21, 54 P.3d 1177 (explaining that when considering a claim that the evidence is insufficient, appellate courts must view the evidence in a light most favorable to the verdict).

¶31 Although the evidence favorable to Francis demonstrated that he had earned $15,000 in commissions for the first quarter and that DME's sales had remained steady throughout the year, the jury could not reasonably have extrapolated from this that Francis would have earned the same amount in commissions for the remaining three quarters, or $60,000 for the year. Francis's employment agreement entitled him to commissions equal to 4% of the Salt Lake branch's net profits, excluding profits from sales of oxygen. Using the $600,000 net-profits figure presented at trial and even if that entire amount came from the Salt Lake branch (and none of it was from sales of oxygen), a $60,000 commission would be equivalent to 10% of those profits, a percentage well above the 4% maximum allowed by contract. As a result, the evidence does not support a straight-line extrapolation of his $15,000 first-quarter commission through the rest of the year.

¶32 As we noted, Francis argues that $24,000 is a particularly appropriate award because it is precisely 4% of DME's entire profits. But for Francis to be entitled to receive $24,000 in commissions, he would have had to put on evidence to show that the Salt Lake branch generated all company profits and none of those profits came from oxygen sales. In the absence of evidence of this sort, the jury simply could not have assumed that DME's entire annual profit was attributable to the sole source of revenue that benefitted Francis. *See Price–Orem Investment Co. v. Rollins, Brown & Gunnell, Inc.*, 784 P.2d 475, 478 (Utah Ct. App. 1989) (recognizing that the plaintiff bears the burden of proving damages). Consequently, Francis's damages

must be limited to actual damages demonstrated at trial. In this regard, although Francis testified that his first quarter commissions amounted to $15,000, he conceded that DME had already paid him $5,300 and that the balance owed for the first quarter was therefore $9,700. Accordingly, we reduce the judgment to $9,700, the amount actually proved at trial.[3]

B.     The Trial Court Did Not Abuse Its Discretion in Excluding Evidence Regarding the Circumstances of Francis's Termination from DME.

¶33     DME next argues that the trial court erred when it excluded evidence of the circumstances surrounding DME's termination of Francis's employment. Specifically, DME argues that the evidence should have been admitted because without it, the jury would have been left to speculate about the reasons for Francis's termination, which may have resulted in prejudice to DME if the jury assumed that Francis "was the victim of a greedy employer interested in maximizing its profits at the expense of its employees." DME further argues that the evidence would have allowed it to argue that Francis had a motive to retaliate against DME and that it was also probative of Francis's character for truthfulness. We disagree.

---

3. DME also argues that it was prejudiced by the trial court's decision to alter its ruling with respect to the damages issue. Specifically, DME argues that it relied on the trial court's first ruling, which appeared to cap Francis's damages at $9,700, and, as a consequence, withheld evidence during its case-in-chief that would have rebutted the extrapolation theory that the court subsequently allowed Francis to present to the jury during closing arguments. Because we have reduced the judgment to $9,700 on DME's insufficient evidence argument, we need not reach DME's prejudice argument.

¶34    Rule 403 of the Utah Rules of Evidence provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[4] In interpreting this rule, we have held that "the trial court is granted broad discretion when weighing the probative value of evidence against the reasons for exclusion enumerated in rule 403." *Glacier Land Co. v. Claudia Klawe & Assocs., LLC*, 2006 UT App 516, ¶ 24, 154 P.3d 852. Such discretion is appropriate because "the trial court is in the best position to make evidentiary rulings as they arise because it can review, among other things, the claims and the evidence already admitted or proffered." *Id.*

¶35    Here, the trial court determined that the evidence concerning the circumstances of Francis's termination was both irrelevant and unfairly prejudicial. Such a determination is well within the court's discretion. This is not a wrongful termination claim where the particular circumstances supporting termination might be pertinent to the outcome; rather, the issue is whether Francis was in fact entitled to commission payments for the work that he performed while he was actually employed. Furthermore, as the trial court noted, the circumstances of the termination have no bearing on Francis's character for truthfulness. It is "too far of a stretch" to argue that Francis's behavior equates to dishonesty. Finally, we are not persuaded that this evidence was necessary to prevent the jury from imputing evil motives to DME. Accordingly, we conclude that

---

4. Because changes made to the Utah Rules of Evidence since the time this lawsuit was filed are stylistic only, we cite the current version of the rules throughout this opinion as a courtesy to the reader.

the trial court did not exceed its discretion when it excluded this evidence.

C.     The Trial Court's Interpretation of Section 34-27-1 of the Utah Code Was Correct, but Because Francis's Judgment Is Less than His Demand, He Is Not Entitled to Attorney Fees.

¶36    DME's next argument is that the trial court erred in awarding Francis the attorney fees he incurred in pursuing his claim for wages. Francis requested fees under section 34-27-1, which reads as follows:

> Whenever a mechanic, artisan, miner, laborer, servant, or other employee shall have cause to bring suit for wages earned and due according to the terms of his employment and shall establish by the decision of the court that the amount for which he has brought suit is justly due, and that a demand has been made in writing at least fifteen days before suit was brought for a sum not to exceed the amount so found due, then it shall be the duty of the court before which the case shall be tried to allow to the plaintiff a reasonable attorneys' fee in addition to the amount found due for wages, to be taxed as costs of suit.

Utah Code Ann. § 34-27-1 (LexisNexis 2011).[5] DME argues that Francis's claim must fail because he failed to make a written demand for his wages at least fifteen days prior to filing suit. We need not resolve this specific claim because we conclude that Francis's claim fails on a different ground.

---

5. Because the current versions of the statutes cited in this opinion do not differ from the versions in effect at the time of trial, we cite the current versions as a courtesy to the reader.

¶37    In order to recover attorney fees under section 34-27-1, an employee must make a demand for unpaid wages "in writing at least fifteen days before suit was brought *for a sum not to exceed the amount*" that is later established by the court to be "justly due." *Id.* (emphasis added). Neither party contends that this language is ambiguous. Thus, "we look to the plain meaning of [the] unambiguous statutory language." *Pickett v. Utah Dep't of Commerce*, 858 P.2d 187, 191 (Utah Ct. App. 1993). "And [w]hen discerning the plain meaning of the statute, terms that are used in common, daily, nontechnical speech, should, in the absence of evidence of a contrary intent, be given the meaning which they have for laymen in such daily usage." *Francis v. State*, 2013 UT 65, ¶ 41, 321 P.3d 1089 (alteration in original) (citation and internal quotation marks omitted). Using this plain meaning approach, we conclude that section 34-27-1 requires a demand for unpaid wages not to exceed the ultimate judgment. In other words, recovery of attorney fees is authorized only when the employee has obtained a judgment in an amount equivalent to or higher than the amount he or she sought to recover.

¶38    Francis sent DME a letter on April 6, 2005, claiming that DME owed him "approximately $15,000 in commissions . . . for sales he made while still employed with the company." For purposes of appeal, we will assume without deciding that this letter constitutes a written demand for unpaid wages that complies with section 34-27-1. But because Francis's "demand" letter sought $15,000 and he has recovered just $9,700, he has failed to meet the statute's requirement that his demand be in "a sum not to exceed the amount so found [to be] due." *See* Utah Code Ann. § 34-27-1. Thus, we vacate the award of attorney fees.

D.    DME Has Not Shown the Trial Court Erred in Applying Section 15-1-1 of the Utah Code.

¶39    DME's final argument is that the trial court erred in awarding Francis prejudgment interest at the rate set in Utah Code section 15-1-1. That statute provides that "[u]nless parties

to a lawful contract specify a different rate of interest, the legal rate of interest for the loan or forbearance of any money, goods, or chose in action shall be 10% per annum." Utah Code Ann. § 15-1-1(2) (LexisNexis 2013).

¶40    The parties offer competing interpretations of this statute. DME argues that because this case does not concern a "loan or forbearance," the statute does not apply. In other words, DME claims that the "money, goods, or chose in action" clause is simply a list of the types of loans or forbearances that fall under this statute. In support of this interpretation, DME points to a footnote in *Consolidation Coal Co. v. Utah Division of State Lands & Forestry*, 886 P.2d 514 (Utah 1994), *abrogated on other grounds by State ex rel. School & Inst. Trust Land Admin. v. Mathis*, 2009 UT 85, 223 P.3d 1119, where Chief Justice Zimmerman expressed, in dicta and individually rather than as part of the panel, "serious reservations" about precedent that "purports to tie prejudgment interest rates in all contract cases to the section 15-1-1 rate in effect at the time the contract was signed." *Id.* at 524 n.13. Chief Justice Zimmerman stated that, in his view, the plain language of the statute "seems to indicate that the section was intended to apply only to a 'loan or forbearance' of 'money, goods or chose in action'" and noted the subject of *Consolidation Coal* was "the sale of mineral rights, not a loan or forbearance." *Id.* (citation omitted); *see also Wilcox v. Anchor Wate Co.*, 2007 UT 39, ¶ 45, 164 P.3d 353 (acknowledging that *Consolidation Coal* implied in dicta that section 15-1-1 "does not necessarily even apply in all contract cases"). DME argues that, as in *Consolidation Coal*, this case also does not include a "loan or forbearance" and so a rate of interest other than the 10% rate provided in section 15-1-1 should apply. Specifically, it advocates for application of a 3.28% interest rate because that was "the post judgment rate of interest for 2004, which is the year that National DME failed to pay commissions to Mr. Francis."

¶41 Francis, on the other hand, asserts that section 15-1-1 applies generally to all choses in action and that the absence of a "loan or forbearance" does not matter. He points us to *Sundial Inc. v. Villages at Wolf Hollow Condominium Homeowner's Ass'n, Inc.*, 2013 UT App 223, 310 P.3d 1233. In that case, the court quoted section 15-1-1 with the following alterations: "'[T]he legal rate of [prejudgment] interest for . . . any . . . chose in action shall be 10% per annum.'" *Id.* ¶ 8. This recitation of the statute implies that choses of action qualify for the statutory rate regardless of whether a loan or forbearance is involved and that "loan or forbearance" applies only to the word "money." *See id.* Though the question before us now was not before those courts, section 15-1-1 has been applied in other cases involving a chose in action instead of a loan or forbearance. *See, e.g.*, *Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶¶ 50–55 & n.20, 210 P.3d 263 (affirming the trial court's application of section 15-1-1 to a breach of contract claim); *Mont Trucking, Inc. v. Entrada Indus., Inc.*, 802 P.2d 779, 782 (Utah Ct. App. 1990) (same); *Fitzgerald v. Critchfield*, 744 P.2d 301, 304 (Utah Ct. App. 1987) (same).

¶42 A third possible interpretation of section 15-1-1 reveals itself in Judge Bench's separate opinion on the prejudgment interest issue in *Consolidation Coal*. *See* 886 P.2d at 529 n.1 (Bench, J., concurring and dissenting). In response to Chief Justice Zimmerman's concern that section 15-1-1 does not apply to all contract claims, Judge Bench reasoned that "[p]rejudgment interest is designed to compensate the nonbreaching party that finds itself, *by virtue of the breach*, in the position of loaning money or forbearing what is owed by the breaching party." *Id.* (emphasis added). And "because of the underpayment of royalties by [one party], the [responding party] found itself in the position of loaning or forbearing money it was owed." *Id.* Judge Bench's interpretation of "loan or forbearance" to include the natural result of withholding by one party of funds it legally owes to another seems to find support in the general policy underlying the concept of prejudgment interest. *See, e.g., Trail*

*Mountain Coal Co. v. Utah Div. of State Lands & Forestry*, 921 P.2d 1365, 1370 (Utah 1996) ("As a matter of public policy, an award of prejudgment interest simply serves to compensate a party for the depreciating value of the amount owed over time and, as a corollary, deters parties from intentionally withholding an amount that is liquidated and owing."); *see also L & A Drywall, Inc. v. Whitmore Constr. Co.*, 608 P.2d 626, 629 (Utah 1980) (stating that prejudgment interest "represents an amount awarded as damages due" to a party's failure or delay in paying the amount owed under a contract).

¶43    The question of whether an action must specifically be a "loan or forbearance" was not at issue in either *Consolidation Coal* or *Sundial. See Consolidation Coal*, 886 P.2d at 524 n.13; *Sundial*, 2013 UT App 223, ¶¶ 7–10. Indeed, Chief Justice Zimmerman noted in *Consolidation Coal* that "because [the responding party] has failed to raise this issue and its resolution is not necessary for a disposition of this case, we decline to address it." 886 P.2d at 524 n.13. We have found no case that squarely addresses the correct interpretation of the phrase "loan or forbearance of any money, goods, or chose in action." *See* Utah Code Ann. § 15-1-1(2).

¶44    Normally, "[w]hen interpreting statutory language, we first examine the statute's plain language and resort to other methods of statutory interpretation only if the language is ambiguous." *State v. Masciantonio*, 850 P.2d 492, 493 (Utah Ct. App. 1993). Here, the fact that varying interpretations exist in other cases suggests that interpreting this statute requires a more complex analysis on our part than DME's sparse briefing seems to justify. DME references only two authorities in support of its position—Chief Justice Zimmerman's individual footnote in *Consolidation Coal*, 886 P.2d at 524 n.13, and a case that merely recognizes the possibility that all contracts might not be governed by section 15-1-1, *see Wilcox*, 2007 UT 39, ¶ 45. DME fails to engage with the authority raised by Francis and does not

acknowledge any of the other ways in which this statute has been applied or interpreted. We conclude that DME's analysis is simply not sufficient to convince us that the trial court erred when it applied section 15-1-1 in accordance with at least one of the interpretations of that statute available to it, and we have not been placed in a position to adequately address the issue of interpretation on the case before us. *See Nebeker v. Summit County*, 2014 UT App 244, ¶ 27, 338 P.3d 203 ("Even if a careful analysis of [pertinent case law] might convince us that the facts of this case mandate one result or the other, we will not conduct that analysis on a party's behalf." (citation and internal quotation marks omitted)). Accordingly, we affirm the trial court's application of the 10% interest rate established in section 15-1-1.

## II. Francis's Cross-Appeal

¶45   We now turn to the two issues raised by Francis in his cross-appeal. First, he argues that the trial court erred in granting DME's motion for a directed verdict with respect to his intentional interference with economic relations claim (the interference claim). Second, Francis argues that the court should have allowed him to testify to the contents of a voicemail message he says he received from his BSN supervisor about the reason BSN let him go.

### A.   The Trial Court Erred in Entering a Directed Verdict on Francis's Interference Claim.

¶46   Francis asserts that he introduced enough evidence to support a verdict in his favor on the interference claim and that therefore it ought to have been submitted to the jury. We agree.

¶47   Our supreme court has explained that "[a] trial court is justified in granting a directed verdict only if, examining all evidence in a light most favorable to the non-moving party, there is no competent evidence that would support a verdict in

the non-moving party's favor." *Merino v. Albertsons, Inc.*, 1999 UT 14, ¶ 3, 975 P.2d 467. Thus, we will affirm the trial court's grant of DME's motion for a directed verdict on the interference claim only if there was "no competent evidence that would support a verdict" in Francis's favor. *See id.* Because we conclude that there was competent evidence that could have supported a verdict for Francis on the interference claim, we reverse.

¶48 In order to recover for intentional interference with economic relations, one of the elements the plaintiff must prove is that the defendant "caus[ed] injury to the plaintiff." *Eldridge v. Johndrow*, 2015 UT 21, ¶ 13, 345 P.3d 553 (citation and internal quotation marks omitted). The trial court granted DME's motion because it concluded that Francis had failed to present sufficient evidence regarding causation. That is, it did not believe that Francis had presented evidence regarding the causal link between the communications between BSN and DME regarding the alleged noncompete agreement and Francis's termination from BSN.

¶49 Our supreme court has indicated that an interference claim requires proof of "proximate cause." *Pratt v. Prodata, Inc.*, 885 P.2d 786, 789 (Utah 1994), *overruled on other grounds by Eldridge*, 2015 UT 21. Generally, "the question of proximate cause raises an issue of fact to be submitted to the jury for its determination." *Harline v. Barker*, 912 P.2d 433, 439 (Utah 1996) (citation and internal quotation marks omitted). Proximate cause is defined as "that cause which, in natural and continuous sequence[] (unbroken by an efficient intervening cause), produces the injury and without which the result would not have occurred. It is the efficient cause—the one that necessarily sets in operation the factors that accomplish the injury." *Id.* (alteration in original) (citation and internal quotation marks omitted). And the court has held that proximate cause may be demonstrated by circumstantial evidence: "Jurors may not speculate as to possibilities; they may, however, make justifiable

inferences from circumstantial evidence to find negligence or proximate cause." *Lindsay v. Gibbons & Reed*, 497 P.2d 28, 31 (Utah 1972).

¶50    In *Harding v. Atlas Title Insurance Agency, Inc.*, 2012 UT App 236, 285 P.3d 1260, we discussed the issue of using circumstantial evidence (i.e., inferences) to show proximate cause. *Id.* ¶¶ 7–8. In that case, we observed that

> [w]hile it is sometimes subtle, there is in fact a difference between drawing a reasonable inference and merely speculating about possibilities. [A]n inference is a deduction as to the existence of a fact which human experience teaches us can reasonably and logically be drawn from proof of other facts. On the other hand, speculation is defined as the act or practice of theorizing about matters over which there is *no certain knowledge*. The difference lies in the existence of underlying facts supporting the conclusion. In the case of a reasonable inference, there is at least a foundation in the evidence upon which the ultimate conclusion is based; in the case of speculation, there is no underlying evidence to support the conclusion. Thus, so long as there exists sufficient evidence upon which a reasonable inference regarding proximate cause may be drawn, summary judgment is inappropriate.

*Id.* ¶ 7 (second alteration in original) (emphasis added) (citations and internal quotation marks omitted).

¶51    In this case, when the evidence is viewed in a light most favorable to Francis, there was "at least a foundation in the evidence upon which the ultimate conclusion" of proximate cause could have been based. *See id.* DME sent a letter to Francis on June 17, 2004, threatening to sue to enforce an alleged noncompete agreement if Francis did not leave his employment

at BSN. DME also sent a copy of the letter to BSN. BSN was concerned enough to then question Francis about the alleged noncompete. But Francis's assurances that he had never signed a noncompete agreement with DME were apparently insufficient to allay BSN's concerns, as the company wrote directly to DME on July 14, 2004, in order to "coordinate . . . regarding Mr. Francis'[s] status and obligations." DME never responded to this letter, and the next written communication Francis received from BSN was the termination email dated August 12, 2004.

¶52 Thus, BSN terminated Francis just two months after it received notice that DME was threatening legal action against Francis for violation of a noncompete agreement precipitated by BSN's hiring him. In addition, BSN had also been concerned enough to approach both Francis and DME to discuss the noncompete agreement and its implications for the relationship between BSN and Francis. The discussion with Francis failed to resolve BSN's concerns, and the lack of any response from DME could not have been reassuring. We believe that the jury reasonably could have inferred from this evidence that the alleged noncompete agreement was the proximate cause of BSN's decision to terminate Francis. Although alternative explanations are possible, "[a] directed verdict is only appropriate when the court is able to conclude, as a matter of law, that reasonable minds would not differ on the facts to be determined from the evidence presented." *Management Comm. of Graystone Pines Homeowners Ass'n v. Graystone Pines, Inc.*, 652 P.2d 896, 897–98 (Utah 1982). As we have discussed, that is not the case here: the inferences that could reasonably have been drawn from the evidence presented at trial were sufficient to raise an issue of fact as to whether DME's actions caused BSN to terminate Francis. Accordingly, a directed verdict was inappropriate. *Cf. Kerr v. City of Salt Lake*, 2013 UT 75, ¶ 38, 322 P.3d 669 ("We uphold a trial court's denial of a directed verdict if the evidence at trial raised a question of material fact which precluded judgment as a matter of law." (citation and internal

quotation marks omitted)). We therefore reverse the trial court's grant of a directed verdict on the interference claim and remand this case for further proceedings consistent with this decision.[6]

B.     The Trial Court Correctly Determined that Evidence Regarding the Voicemail Was Inadmissible Hearsay.

¶53    Francis sought to testify at trial about the contents of a voicemail message he received from his BSN supervisor concerning the circumstances of his termination. According to Francis, his supervisor told him in a voicemail that "because we're going to an employee/employer relationship, human resources feels like the noncompete agreement precludes my being able to keep you on in your territory" and that "he had sent [Francis] a letter of release." (Emphasis omitted.) DME filed a motion in limine to exclude Francis's testimony because it was hearsay. The trial court agreed. Francis argues that the trial court abused its discretion in ruling that his testimony regarding the voicemail's content was inadmissible hearsay. He argues this error was prejudicial because the evidence was "material to the issue of causation" in that it tied his firing to DME's actions with respect to the alleged noncompete agreement. In the alternative, Francis argues that even if his testimony was hearsay, it was admissible under the state of mind exception to the hearsay rule. *See* Utah R. Evid. 803(3). As this issue might arise again on remand, we address it in order to provide the trial court with some guidance.

¶54    The Utah Rules of Evidence define "hearsay" as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence

---

6. Because we conclude that DME's motion for a directed verdict was granted in error, we need not address Francis's argument that the trial court also erred when it later refused to reconsider its decision to grant the motion.

to prove the truth of the matter asserted in the statement." Utah R. Evid. 801(c). Hearsay evidence is generally inadmissible unless an exception applies. *Id.* R. 802; *id.* R. 803 (identifying hearsay exceptions).

¶55    We agree with DME that the proffered statements constitute hearsay. Francis contends the statements are not hearsay because he was not offering the contents of the voicemail to prove that a non-compete agreement existed, but to provide a "context [for] the termination," i.e., "to show that BSN had knowledge of a non-compete agreement." But his proposed use of the evidence goes beyond that; he argues that the statements aid in "understanding . . . the reason for his termination," in particular that "BSN connected the noncompete to its [dis]continuation of Mr. Francis's contract." Thus, it is apparent that Francis offered the voicemail statements for their truth. Accordingly, we conclude the trial court did not err in concluding that the testimony, as presented, was "being offered to prove exactly what's contained therein[,] [t]hat [BSN] terminated him because [it was] told that he was subject to a noncompete clause." In short, the court properly classified Francis's proposed testimony as hearsay because, according to Francis himself, the voicemail statements would only be relevant if offered to prove the truth of the matter asserted in the statement—that Francis was fired by BSN because of DME's assertions that Francis's employment with BSN violated a noncompete agreement between DME and Francis.

¶56    Francis claims in the alternative that his testimony about the voicemail should have been admitted under the state of mind exception to the hearsay rule. The state of mind exception is described in rule 803 as a "statement of the declarant's then-existing state of mind . . . or emotional, sensory, or physical condition . . . but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will." Utah R. Evid. 803(3). To

fall within the state of mind exception, a statement must be "expressly assertive of the present state of mind or bodily condition . . . of the declarant." R. Collin Mangrum & Dee Benson, *Mangrum & Benson on Utah Evidence* 768 (2013–14). Such a statement is admissible if

> (i) the statement was made under circumstances that indicate its reliability and (ii) it is relevant to show intent, plan, motive, design, malice, or ill will when the defendant's state of mind is an issue in the case or (iii) it is relevant to prove or explain acts or conduct of the defendant.

*Id.* at 783 (citation and internal quotation marks omitted); *see also State v. Dibello*, 780 P.2d 1221, 1225, 1228 (Utah 1989) (allowing testimony that an alleged murderer threatened to kill the victim if she ever left him because a jury could infer the defendant's intent from his threats).

¶57    And if a statement is "offered to prove conduct, then the statement . . . must relate to the intent (rather than memory) of the declarant" to commit an act in the future rather than a past act. R. Collin Mangrum & Dee Benson, *Mangrum & Benson on Utah Evidence* 783–84, 788 (2013–14); *see also Shepard v. United States*, 290 U.S. 96, 98, 103, 106 (1933) (holding a victim's statement inadmissible under this exception because the statement "faced backward and not forward" and "spoke to a past act"); *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 295–96 (1892) (allowing hearsay evidence under the state of mind exception because the evidence showed the future intentions of a potential victim). In other words, hearsay statements demonstrating future intent are admissible under this exception but statements explaining past actions are not.

¶58    Francis argues that his statements about the voicemail fit into the state of mind exception because they show the "motivation and state of mind" behind BSN's decision to

terminate his employment contract. However, the trial court correctly determined that the state of mind exception does not apply here because the voicemail stated the motivation for a past action rather than a present state of mind or an intended future act. Indeed, Francis's proffer explicitly stated that the supervisor had *already* sent Francis the termination letter. Because the supervisor's call came after BSN had sent the termination letter, the trial court could reasonably have concluded that BSN had already made the decision to terminate Francis's employment before the voicemail and that the statements were therefore about BSN's motivation for a past action rather than a present or future intention.

¶59 We conclude it was thus within the trial court's discretion to decide that the contents of the voicemail related to conduct that had already occurred, as opposed to a "statement of the declarant's then-existing state of mind," and that, accordingly, the proffered statement did not fall within the state of mind exception to the hearsay rule. *See* Utah R. Evid. 803(3). As the circumstances under which this evidence might be offered might differ on remand, however, nothing in our analysis here is meant to restrict the trial court's evaluation of the issue when faced with it anew.

## III. Attorney Fees on Appeal

¶60 The final matter before us is Francis's request for attorney fees incurred in this appeal. "A party who is awarded fees below and prevails on appeal is entitled to recover its attorney fees reasonably incurred on appeal." *Osmond Lane Homeowners Ass'n v. Landrith*, 2013 UT App 20, ¶ 33, 295 P.3d 704. Here, the trial court determined that Francis was entitled to attorney fees for his unpaid wage claim pursuant to section 34-27-1 of the Utah Code. However, because we have concluded that the trial court's award of fees on Francis's wage claim must be vacated, *see supra* ¶ 38, there is no longer a basis for an award of fees on appeal. *See Osmond Lane*, 2013 UT App 20, ¶ 33.

CONCLUSION

¶61    The trial court acted within its discretion when it excluded evidence regarding the circumstances of DME's termination of Francis's employment. The trial court also acted within its discretion when it excluded as inadmissible hearsay Francis's testimony regarding the contents of the voicemail he received from his BSN supervisor. And we affirm the trial court's application of the interest rate set forth in section 15-1-1.

¶62    We conclude, however, that the trial court erred when it denied DME's motion to reduce the $24,000 judgment for past commissions, and we order the amount of that judgment reduced to $9,700. The trial court also erred in its interpretation and application of section 34-27-1. We therefore vacate the award of attorney fees. We further conclude that the trial court erred when it granted DME's motion for a directed verdict with respect to Francis's interference claim. Accordingly, we reverse and remand for further appropriate proceedings on that claim for relief.

––––––––––