2025 UT App 112

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ROBERT M. CHRISTIAN,
Appellant.

Opinion
No. 20220753-CA
Filed July 17, 2025

Fourth District Court, Provo Department
The Honorable Kraig Powell
No. 191400703

Emily Adams and Rachel Phillips Ainscough,
Attorneys for Appellant

Derek E. Brown and William M. Hains,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES RYAN M. HARRIS and AMY J. OLIVER concurred.

TENNEY, Judge:

¶1 Robert Christian was convicted of three counts of sodomy on a child and four counts of sexual abuse of a child. On appeal, Christian challenges his convictions on three grounds: first, he argues that the district court improperly allowed the alleged victim to testify about non-charged acts of sexual abuse; second, he argues that his trial counsel provided ineffective assistance by not objecting to a photograph that was introduced at trial showing Christian wearing a dress at his wedding; and third, he argues that his counsel provided ineffective assistance by not objecting to a portion of the prosecutor's rebuttal argument. Christian has also filed a motion requesting a remand under rule 23B of the Utah

Rules of Appellate Procedure. For the reasons set forth below, we affirm Christian's convictions and deny his motion for a remand.

BACKGROUND[1]

*The Abuse*

¶2      Justin[2] and his family moved into a condo in Cedar Hills in July 2008, when he was ten years old, and they lived there until 2013. At the time that Justin's family moved in, Christian lived in a condo next to theirs with his wife, his children, and his mother-in-law. Christian lived there until he moved out in 2010.

¶3      Christian started conversing with Justin as Justin "would go to and from school." Christian talked to Justin "about different things" like "video games." Justin would get home from school around 3:30 p.m., and since his parents usually got home from work around 6:00 or 7:00 p.m., Justin was often home alone. Justin "felt neglected" by his family, and he felt like Christian was his only friend. Justin soon started going over to Christian's condo, where the two would play video games. Christian would also sometimes go over to Justin's condo. Justin later explained that they would "look at each other's schedules and see when no one" else was home, and the two would then "schedule little times to meet."

¶4      The first time that Christian made physical contact with Justin was on Justin's porch. Justin remembered that he was "sad about something" and Christian "hugged" him. After that,

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Samples*, 2022 UT App 125, n.3, 521 P.3d 526 (quotation simplified).

2. A pseudonym.

hugging "became a part of [their] relationship." At one point, Christian told Justin that "it would be fun" to try "on girl's clothes" and makeup. They did, and this kind of activity soon "became more frequent" in their relationship. As time went on, Christian began touching Justin in sexual ways that involved spanking, groping, and other forms of sexual conduct.

¶5 At trial, Justin testified in particular detail about four instances of sexual abuse. During the first of these instances, which occurred at Justin's condo, Justin wore "girl's pink underwear" and Christian "put makeup on" him. Christian then carried Justin to the stairwell, directed Justin to lean over the railing, spanked Justin with a belt, rubbed Justin's buttocks, pulled Justin's underwear down, and continued to spank and rub Justin's bare buttocks.

¶6 During the second instance, which occurred in Justin's bedroom, Justin was wearing "the same pink underwear" while Christian was "spooning" Justin in Justin's bed. Christian was behind Justin and "put his hand in the underwear." Christian then "grabbed" Justin's penis and "masturbated" Justin until he ejaculated.

¶7 During the third instance, which also occurred in Justin's bedroom, Christian pulled down Justin's underwear and "licked [his] penis." Christian then pulled down his own underwear and "put his penis in [Justin's] mouth" while "thrusting in and out" until he "ejaculated in [Justin's] mouth." In his testimony, Justin said that he remembered this instance because, as he stated, "I remember choking on his semen, and I still remember the taste."

¶8 During the fourth instance, which again occurred in Justin's bedroom, Justin was again "wearing girl's underwear," and Christian began by spanking his buttocks "cheek by cheek." Christian "pulled the underwear down" and continued spanking Justin. Christian then "told [Justin] to get up on all fours," at which point Christian "put his penis in" Justin's anus.

¶9      In addition to these four incidents, Justin also testified in more generalized terms that similar acts of abuse had occurred over a two-year period between August 2008 and December 2010. In response to questioning from the prosecutor, Justin said that Christian "spanked" him 15 to 20 times, "groped" him 6 times, performed oral sex on him twice, and received oral sex from Justin twice.

¶10     Christian threatened Justin that if he told anyone about the abuse, Christian would "spank [him] more." This made Justin feel "controlled" and "like [he] was a slave."

¶11     Justin didn't disclose Christian's abuse to his family until he was 18 years old. Justin later testified that he waited years to tell anyone about the abuse because he "felt emasculated and sexually confused." At the time of his initial disclosure to his family, Justin didn't want to report the abuse to police. Justin later participated in therapy, during which he disclosed the abuse to his therapist. Justin subsequently reported the abuse to police.

*The Charges and Pretrial Motions*

¶12     The State initially charged Christian with five counts of sodomy on a child, ten counts of sexual abuse of a child, and one count of lewdness involving a child. After a preliminary hearing, Christian was bound over on all counts. The State later decided to proceed on only seven counts—three counts of sodomy on a child and four counts of sexual abuse of a child—explaining that it was doing so to get the "trial down to a manageable level." The State filed an amended information to reflect the reduced number of charges. Alongside that amended information, the State filed a bill of particulars setting forth facts relating to the seven counts that it intended to prove at trial.

¶13     Before trial, Christian's counsel (Counsel) filed a motion in limine to exclude a photograph that showed Christian wearing a

dress during his wedding to his current husband.[3] Counsel argued that the photograph was not relevant to the alleged criminal conduct and that it was unfairly prejudicial because, in Counsel's words, the "assumption that the State is impliedly making is that because [Christian] is gay and dresses accordingly on occasions, he must be the person who committed the[se] crimes." The district court granted the motion, excluding the photograph "subject to the right to present [it] appropriately for rebuttal or impeachment."

¶14 Christian also filed a motion in limine seeking to limit the State's evidence to that which was described in the bill of particulars. In that motion, Christian asserted that he had not been given proper notice of any evidence of any other acts of alleged abuse. In its written response, the State argued that Christian had been given notice at the preliminary hearing that it might use such evidence, and the State further asserted at oral argument that the evidence was admissible under rule 404(c) of the Utah Rules of Evidence, which permits "evidence that the defendant committed any other acts of child molestation to prove a propensity to commit the crime charged." Utah R. Evid. 404(c)(1). At a subsequent hearing, the State again argued that Justin should be allowed to testify about other uncharged acts pursuant to rule 404(c). The day before trial, the district court issued a ruling denying Christian's motion. There, the court concluded that Christian had "been provided ample notice from the very beginning of this case that the State has evidence of other instances of alleged child molestation that were provided in the preliminary hearing, and that were charged in previous instances of the Information." The court further held that, pursuant to rule

---

3. As will be discussed in more detail below, Christian was married to a woman during the years in which he lived across from Justin's family, but during the intervening years, he had divorced his wife and married a man.

404(c), the State could "introduce evidence of other alleged sexual activity with this particular alleged victim."

¶15    Counsel then requested a continuance because he felt he was not "properly prepared" to address the uncharged instances of abuse. The court denied Counsel's request for a continuance, explaining as follows:

> Put simply, if the jury hears that these things happened three times . . . or a total of seven times . . . or if the jury hears that that happened ten times or twelve times, or I think as [the prosecutor] clarified in the most recent oral argument, approximately twenty times, the Court does not find that to be a qualitative difference in the jury's understanding of the alleged pattern of behavior that is alleged by the defendant in this case.
>
> So the Court does not find it prejudicial to the defendant's case if it was twenty times rather than seven times—overly, unduly prejudicial; and the Court does find it to be relevant evidence for purposes of the alleged victim being able to describe the story, especially in this case where the defendant's defense apparently will be that these things did not happen, could not have happened, and that the alleged victim does not properly remember—does not accurately remember.

*The Trial*

¶16    At trial, the State presented its case through the testimonies of Justin, Justin's brother, Justin's father, and Justin's mother. Justin testified to the instances of abuse described above. Justin's family members testified about their interactions with Christian, changes in Justin's behavior that they observed after the family

moved to the condo, Justin's disclosure of Christian's abuse, and Justin's exceptional memory.

¶17    During the defense's case, Christian called six witnesses—himself, his ex-wife, his daughter, his ex-mother-in-law, his current husband, and an expert. Christian testified about coming out as gay in 2009, ending his marriage in 2010, and marrying his current husband in 2016. He denied ever performing sexual acts on Justin, dressing Justin in pink underwear, bringing Justin to his family's condo, or putting makeup on Justin. He said he knew "[v]ery little" about Justin's family, and he said that while he recalled meeting Justin's father once, he didn't recall ever meeting Justin or his mother.[4]

¶18    Christian also testified about his work schedule during the time of the alleged abuse. He said that when he first moved to Cedar Hills, he worked a shift at his job in Taylorsville from 6:00 a.m. to 2:30 p.m., and he said that at some point in 2008, he switched to a shift that had him working from 10:30 a.m. to 7:00 p.m. He added that his commute time varied depending on traffic, and he claimed that when there was traffic, his drive home would take roughly "an hour and a half." Christian also said that, sometime in 2009, he started giving a coworker (Coworker) rides

---

4. By contrast, Justin's father testified in detail about an interaction he had with Christian as Justin's family was moving out in which Christian came to the door, asked about Justin, and insisted that he needed to see Justin. And Justin's brother testified about an incident in which he was unexpectedly home one day from college in 2009, Christian knocked on the door during the afternoon, and then Christian seemed surprised and "totally afraid" when the brother answered the door. According to the brother's account, Christian asked if his mother was home and then left.

to and from work, which made his commute approximately 30 minutes longer.[5]

¶19 On cross-examination, the State asked Christian about cross-dressing. Christian admitted that he had cross-dressed on certain occasions, namely on "a couple of Halloweens" (once in 1976, when he was in third grade, and then once again in 1996), when "go[ing] to the clubs" after he divorced his wife, and "when [he] got married." Counsel did not object to these questions or answers.[6] Christian also denied ever cross-dressing between 2008 and 2010 (which was the period in question with these charges). During its cross-examination, the State also introduced the photograph of Christian wearing a dress at his wedding to his husband. Although Counsel had obtained a pretrial ruling excluding this photograph, Counsel did not object when the State introduced it during the cross-examination of Christian at trial.

¶20 During the defense's case, Christian's ex-wife, ex-mother-in-law, and daughter all testified about their schedules during the time of the alleged abuse. These witnesses also testified about certain times when they had seen, heard of, or been shown

---

5. In conjunction with his direct appeal, Christian has raised an additional claim relating to Counsel's failure to call Coworker in his motion for a rule 23B remand. We address that claim in Part IV below.

6. During the course of the cross-examination, Counsel did object to a few other questions relating to cross-dressing. The court overruled some of them but sustained one of them. As indicated, however, Counsel did not object to the questions or answers we've identified above. On appeal, Christian has not asserted that Counsel's few objections should have constituted a standing objection to any questions or answers about the subject of cross-dressing.

photographs of Christian cross-dressing.[7] Christian's expert also testified about Justin's memories, particularly as they related to Justin's interactions with his therapist. In the expert's view, Justin was constructing memories, Justin's therapist had confirmatory bias, and Justin's therapist had ignored "alternative explanations" for Justin's memories.

¶21 In closing arguments, both the prosecutor and Counsel discussed cross-dressing. In the State's closing, the prosecutor said,

> Even cross-dressing he took too far. He said occasionally cross-dressing from 1976 to 2016, but the more he talked, the more he admitted he cross-dressed, because it started out on just Halloween, but then he's clubbing, right; but his testimony is never, not once during 2008, 2009 and 2010 did I cross-dress.
>
> Why? Because he has to. Because he was cross-dressing. He was abusing a little boy, and dressing this little boy in girl's underwear, and dressing up himself, and in his mind he's got to block that out.

In the defense's closing, Counsel discussed how cross-dressing isn't "as shocking as it used to be." He argued that Justin "had altered memories" that "stemmed from his struggles with his own sexual orientation," such that Christian "became a target" for Justin "to blame for the difficulties he was having in his life." He then pointed to a line from Justin's therapist's notes (which had been admitted during trial) stating that Justin "had difficulty discussing details." Counsel argued that Justin's "testimony is not

---

7. Additional details about this testimony will be recounted in Part II below.

accurate," and from this, Counsel asked jurors to conclude that "the whole case is not guilty."

¶22    In rebuttal, the prosecutor responded to the attacks on Justin's credibility. In doing so, the prosecutor said,

> I mean, things that are just so—they're hard to imagine, even imagining; but how do you describe—how do you find the ability to function when you can feel a 45-year-old erect penis in the back of your 11-year-old throat? Can you fault him for having a hard time to grasp that? Can you fault him for trying to understand how to get the words out as he describes his neighbor's semen hitting the back of his throat, and what it tastes like? And I might add, how do you make up a memory like that? How do you make up what semen tastes like? You don't.

¶23    At the close of trial, the jury convicted Christian on all seven counts.

ISSUES AND STANDARDS OF REVIEW

¶24    On appeal, Christian first argues that the district court plainly erred by not concluding that Justin's testimony about uncharged instances of abuse was inadmissible under rule 403 of the Utah Rules of Evidence. "To prevail on plain error review, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Cesspooch*, 2024 UT App 15, ¶ 7, 544 P.3d 1046 (quotation simplified), *cert. denied*, 550 P.3d 994 (Utah 2024).

¶25 Christian next raises two claims of ineffective assistance—namely, that Counsel was ineffective for not objecting when the State introduced the photograph of him in a dress at his wedding, and that Counsel was also ineffective for not objecting to the prosecutor's rebuttal argument. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *Id.* (quotation simplified).

¶26 Finally, in conjunction with his opening brief, Christian has filed a motion requesting a remand under rule 23B of the Utah Rules of Appellate Procedure. A rule 23B remand is "available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." Utah R. App. P. 23B(a).

ANALYSIS

I. Testimony of Other Incidents

¶27 Christian first argues that the district court plainly erred in not concluding that Justin's testimony about other incidents of sexual abuse (i.e., acts that did not form the basis for any of the seven charges) was inadmissible under rule 403. We disagree.[8]

---

8. We think it appropriate to explain why we're reviewing this issue for plain error. As discussed above, Christian filed a pretrial motion seeking to limit the State's evidence to the offenses described in the bill of particulars, and the bill of particulars, in turn, detailed facts supporting the seven charges. This motion in limine was focused on an alleged lack of notice. In response, the State argued that Justin's testimony about uncharged acts was admissible under rule 404(c) of the Utah Rules of Evidence. The district court denied Christian's motion, explaining that Christian

(continued…)

had "ample notice." Counsel then requested a continuance. In denying that request, the court opined that the evidence was "relevant" to Justin's ability "to describe the story" and that it would not be "unduly prejudicial" for the jury to hear that "it was twenty times rather than seven times."

In his opening brief, Christian asserted that "the district court plainly erred when it did not conduct a full analysis under rule 404(c)." He also suggested that Counsel was ineffective for "not raising the relevance and prejudice inquiry under the [rule] 404(c) analysis." In the course of his plain error argument, Christian argued that—as part of the allegedly missing rule 404(c) analysis—the district court should have assessed whether the evidence was inadmissible under rule 403 and that it should have concluded that it was not. In its responsive brief, the State pointed out that the district court had expressly ruled that Justin's testimony about the uncharged instances was admissible under rule 404(c). The State then argued in the alternative that the evidence was admissible under rules 404(c) and 403.

In his reply brief, Christian withdrew his assertions that the court had failed to conduct "a proper analysis" under rule 404(c) and that Counsel was ineffective for not raising such a concern. But Christian continued to maintain that the court should have excluded Justin's testimony about the uncharged instances under rule 403.

In a footnote in the reply brief, Christian suggested that the rule 403 issue itself may have been separately preserved when the district court ruled that the evidence was both probative and not "unduly prejudicial." But it was too late to make that argument. *See Coleman ex rel. Schefski v. Stevens*, 2000 UT 98, ¶ 9, 17 P.3d 1122 ("[W]e will not consider matters raised for the first time in the reply brief."). And in the opening brief, Christian never claimed that the rule 403 issue (as opposed to the broader rule 404(c) issue) was independently preserved. Instead, Christian treated them together, arguing both under a joint plain error rubric. More to the

(continued…)

¶28 Under rule 403 of the Utah Rules of Evidence, a district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." This rule is "inclusionary," meaning it "imposes the heavy burden not only to show that the risk of unfair prejudice is greater than the probative value, but that it substantially outweighs the probative value." *State v. Smith*, 2019 UT App 141, ¶ 35, 449 P.3d 971 (quotation simplified). District courts have "broad discretion" when conducting this balancing. *Francis v. National DME*, 2015 UT App 119, ¶ 34, 350 P.3d 615 (quotation simplified); *see also State v. Beverly*, 2018 UT 60, ¶ 56, 435 P.3d 160.

¶29 The backdrop for the rule 403 argument at issue here is the rule 404(c) ruling that Christian is no longer challenging. Rule 404(c) states that "[i]n a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other acts of child molestation to prove a propensity to commit the crime charged." Utah R. Evid. 404(c)(1). With this rule, the "drafters of our rules of evidence have determined, as a policy matter, that propensity evidence in child molestation cases can come in on its own terms, as propensity evidence, even if there is no other plausible or avowed purpose for such evidence." *State v. Forbush*, 2024 UT App 11,

---

point, Christian expressly claimed in his opening brief that the district court "erred in *not* analyzing whether the other alleged abuse evidence passed the rule 403 balancing test," before then arguing that the court plainly erred by not excluding the evidence under rule 403. (Emphasis added.) In light of all this, we conclude that Christian's rule 403 argument should be reviewed only for plain error.

¶ 36, 544 P.3d 1 (quotation simplified), *cert. denied*, 550 P.3d 995 (Utah 2024).

¶30　Even so, when the State seeks to introduce evidence under rule 404(c), the evidence "is still subject to rule 403's balancing test." *Id.* ¶ 37 (quotation simplified); *see also State v. Fredrick*, 2019 UT App 152, ¶ 43, 450 P.3d 1154 ("Even though prosecutors need not articulate a non-character purpose for evidence of previous acts of child molestation in order to win its admission, they still must demonstrate that the proposed evidence comports with rules 402 and 403 of the Utah Rules of Evidence."). And as noted, Christian has presented this argument to us through the lens of plain error, which means that he "must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Cesspooch*, 2024 UT App 15, ¶ 7, 544 P.3d 1046 (quotation simplified), *cert. denied*, 550 P.3d 994 (Utah 2024). So viewed, we see no basis for concluding that this evidence was obviously inadmissible under rule 403.

¶31　Starting with the "probative value" prong of the rule 403 balancing, we've held that where several "acts of a sexual nature [are] committed against a single child victim" as "part of an ongoing pattern of abuse," this evidence can have "considerable probative weight." *State v. Lintzen*, 2015 UT App 68, ¶ 19, 347 P.3d 433. "Indeed, the propensity value of the evidence is precisely what makes rule 404(c) evidence so highly probative." *Fredrick*, 2019 UT App 152, ¶ 45.

¶32　This leaves the other side of the rule 403 balancing—here, the dangers of unfair prejudice and cumulative evidence—which, as noted, must substantially outweigh the evidence's probative value. *See* Utah R. Evid. 403.

¶33　On this front, Christian first argues that the evidence was "unfairly prejudicial" because the "repeated" allegations

"bolster[ed]" the credibility of Justin's testimony about the charged offenses. We see no real daylight between this argument and a propensity argument. In other words, Christian seems to be asserting that if the jury was allowed to hear that he had allegedly molested Justin on other occasions, it would be more likely to believe Justin's testimony about the abuse at issue in the charges. But we've held that when evidence is admissible under rule 404(c), the "unfair prejudice" analysis for purposes of rule 403 must "focus[] on prejudice other than the fact that the evidence shows propensity to engage in reprehensible behavior involving children." *State v. Modes*, 2020 UT App 136, ¶ 21, 475 P.3d 153 (quotation simplified). This is so because, "after rule 404(c), the accused's propensity is the reason for admission and no longer constitutes unfair prejudice." *Forbush*, 2024 UT App 11, ¶ 45 (quotation simplified). Christian has not persuaded us that the evidence in question created any other form of unfair prejudice.

¶34    As noted, separate from the danger of unfair prejudice, rule 403 also states that evidence can be deemed inadmissible "if its probative value is substantially outweighed" by the danger of "needlessly presenting cumulative evidence." Utah R. Evid. 403. Addressing this part of the rule, Christian suggests that when Justin testified about other uncharged acts of abuse, this was needlessly cumulative.

¶35    Utah's cases have not given much separate attention to defining the parameters of the "needlessly . . . cumulative" component of rule 403. *Id.* Addressing it briefly, our supreme court has cautioned that "it may . . . be appropriate for a district court to take stock of the need for the evidence or the efficacy of alternative proof before deciding whether evidence should be excluded under rule 403 as cumulative or a waste of time." *State v. Cuttler*, 2015 UT 95, ¶ 19, 367 P.3d 981. Addressing it in more detail, one legal encyclopedia has suggested that, as a general matter,

> Evidence is considered cumulative when it adds nothing to what was already before the jury. Evidence is said to be cumulative when it relates to a matter so fully and properly proved by other testimony as to take it out of the area of serious dispute. Evidence properly excludable as cumulative falls into two categories: (1) evidence supporting an uncontested or established fact, and (2) evidence repeating a point made by previous evidence. Evidence repeating a point made by previous evidence should be excluded as cumulative only with caution, since it by definition concerns a disputed point, and repetition of the same evidence on a disputed point by several witnesses is often persuasive in establishing the truth of that evidence.

29 Am. Jur. 2d *Evidence* § 350 (2025). We agree with this general view.

¶36 In this case, and particularly against the backdrop of the court's rule 404(c) determination, we see no basis for concluding that the testimony in question was "needlessly . . . cumulative," much less obviously so as required to establish plain error. Utah R. Evid. 403. This is so for two reasons.

¶37 First, as noted, rule 404(c) expressly contemplates that evidence of other instances of molestation is probative for the purpose of proving propensity. This is the reason that such evidence is considered to be "highly probative." *Fredrick*, 2019 UT App 152, ¶ 45. As a result, even if the evidence in question could somehow be regarded as cumulative, it wouldn't have been "needlessly" cumulative. Rather, it would have been appropriately cumulative, because the evidence of the additional incidents was admissible to show a propensity to engage in this

kind of behavior. In some sense, the cumulativeness of this evidence was the point.

¶38   Second, we recognize the conceptual possibility that, in some future case, and even with the added context of rule 404(c), there might be an outer point at which the State has put on so much of this kind of evidence that it might be "needlessly cumulative" to allow the State to put on any more. But what happened here fell far short of any such point. Again, the State didn't put on any additional witnesses to testify about any other acts involving any other person. Instead, it only presented testimony from Justin himself, so this issue didn't derail the trial through time-consuming presentation of testimony from multiple witnesses. And even within Justin's testimony, the exchanges about the other incidents were relatively sparse and self-contained. Justin was asked how many times Christian had spanked him (he said 15 or 20), how many times Christian had "groped" him (he said 6), and how many times the two had performed oral sex on each other (he said 2 times each). There was nothing needlessly cumulative about this testimony, much less so cumulative that it would be obvious that it substantially outweighed the evidence's strong probative value, thereby requiring the district court to sua sponte exclude the evidence under rule 403.

¶39   For all these reasons, we see no error, much less obvious error. This claim accordingly fails.

## II. The Photograph

¶40   Christian next argues that he received ineffective assistance when Counsel failed to object to the photograph of him wearing a dress at his wedding. As Christian puts it in his brief on appeal, allowing the jury to see a photograph of him in the dress "primed the jury to believe the State's case that [Christian] acted contrary to societal norms and thus was likely to have abused Justin," thereby "encourag[ing] the jury to accept the State's

theory that [Christian] was a pedophile who groomed and assaulted Justin for years."

¶41    To prevail on this claim, Christian "must show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense." *State v. Devan*, 2024 UT App 193, ¶ 38, 562 P.3d 1233 (quotation simplified), *cert. denied*, 568 P.3d 261 (Utah 2025). To establish deficient performance, Christian "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Forbush*, 2024 UT App 11, ¶ 25 (quotation simplified). "The focus of this inquiry is reasonableness," which we judge "as of the time of counsel's conduct." *Id.* (quotation simplified). To establish prejudice, Christian "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Draper*, 2024 UT App 152, ¶ 80, 560 P.3d 122 (quotation simplified). In assessing prejudice, we "assess counterfactual scenarios of what would have happened but for the ineffective assistance." *Id.* ¶ 109 (quotation simplified).

¶42    Christian "must establish both prongs, and if either is lacking, the claim fails and this court need not address the other." *Devan*, 2024 UT App 193, ¶ 38 (quotation simplified); *see also Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182. In its responsive brief, the State argues that Christian has not established either deficient performance or prejudice. Because we agree with the State that Christian has not established that he was prejudiced, we need not address deficient performance.

¶43    As the State points out, there was a substantial amount of testimony presented at trial about Christian's cross-dressing. Some of this related to Halloween events—Christian testified that he cross-dressed on "a couple of Halloweens," his ex-wife testified that she saw Christian cross-dress "once" on Halloween, his daughter testified that she saw a photograph of Christian

"dressed up as a woman on Halloween night," and Christian's ex-mother-in-law testified that she heard about Christian cross-dressing at a "Halloween party." Separate from the Halloween events, Christian testified that he sometimes cross-dressed when "go[ing] to the clubs" after he divorced his wife. And perhaps most importantly for the issue before us, several witnesses testified that Christian wore a dress at his wedding to his husband. Christian testified that he did so, his daughter testified that she was at the wedding and saw him "in the purple dress," and Christian's ex-wife and Justin both testified that they had seen a photograph of Christian wearing a dress at the wedding.

¶44　On appeal, Christian does not argue that Counsel provided ineffective assistance by not objecting to any of this testimony. Rather, his claim is focused on the assertion that Counsel was ineffective for not objecting to the introduction of the photograph from the wedding.

¶45　We stress here that we are taking no position on Christian's claim, on appeal, that the evidence of him wearing the dress would have been viewed as good or bad in a normative or societal sense. Rather, we are taking the terms of his argument as he has presented it to us. But even with that as the backdrop, we note that while we agree with Christian that there may have been some additional impact for the jury to see the picture (as opposed to just hearing about it), we don't agree that this difference would have been so pronounced as to meaningfully tip the evidentiary scales against Christian. As noted, the trial testimony about Christian's cross-dressing wasn't limited to an isolated reference or two. Rather, there were multiple references to it, from multiple witnesses, and regarding Christian cross-dressing on multiple occasions. As a result, the jury had already been repeatedly prompted to imagine this very kind of image. And again, Christian has not argued that Counsel should have objected to all of this testimony as well.

¶46    Moreover, as the State points out, the defense itself used the idea of Christian cross-dressing—indeed, it used the idea of a *photograph* of Christian cross-dressing—to Christian's benefit. In her testimony, for example, Christian's daughter said that she kept a photograph of Christian cross-dressing on Halloween in her "night stand," and in closing argument, Counsel referred to this portion of her testimony as being "heartwarming" and "beautiful." In light of this, it's now at least a touch inconsistent for Christian to suggest on appeal that Counsel should have sought to exclude another photograph of Christian's cross-dressing as being one that would prompt the jury to think he had a propensity to sexually assault Justin.

¶47    In short, given the array of testimony that came in about this subject at trial, we agree with the State's suggestion that a "hypothetical trial without the . . . photograph of Christian in a dress would have looked nearly indistinguishable from the trial that happened." We accordingly reject this ineffective assistance claim for lack of prejudice.

### III. Prosecutor's Rebuttal

¶48    In the defense's closing argument, Counsel argued that Justin "had altered memories" that "stemmed from his struggles with his own sexual orientation," and Counsel pointed to a line from Justin's therapist's notes (which had been admitted during trial) stating that Justin "had difficulty discussing details." In rebuttal, the prosecutor made the comments described above, including one comment in which he asked jurors, "[H]ow do you describe—how do you find the ability to function when you can feel a 45-year-old erect penis in the back of your 11-year-old throat?" as well as another in which he said, "[H]ow do you make up a memory like that? How do you make up what semen tastes like? You don't." On appeal, Christian argues that Counsel was ineffective for failing to object to these comments, contending that the prosecutor had improperly "asked the jury to put themselves

in Justin's place." As discussed above, Christian can only prevail on an ineffective assistance claim if he shows both deficient performance and prejudice. We conclude that Christian has not shown deficient performance. This is so for two reasons.

¶49    First, it's not at all clear that such an objection would have been meritorious. Christian claims that the prosecutor's rebuttal violated the principles set forth in *State v. Todd*, 2007 UT App 349, 173 P.3d 170. There, we explained that "a prosecutor is prohibited from asking jurors to put themselves in the victim's place." *Id.* ¶ 19. We then held that the prosecutor in that case had committed misconduct by asking jurors to consider what a murder victim "might have told" them if she had been alive to testify. *See id.* ¶¶ 8, 19.

¶50    But as the State points out, we later recognized in *State v. Isom* that there is a "distinction" between asking jurors to put themselves in the place of a "victim" and asking jurors to put themselves in the place of a "witness." 2015 UT App 160, ¶¶ 30, 31, 354 P.3d 791. *Isom* also involved the alleged sexual abuse of a child, and in closing argument there, the prosecutor said to the jury,

> I would ask that you put yourself in her little shoes and think of how you would describe the offenses that occurred to you, how you would be able to help others understand what you experienced, where you were when it happened, where it happened. Why are these people continuing to ask me these questions? Why do I have to talk about things that make me feel uncomfortable? Put yourself in her shoes and use your own adult logic to think about when you were her age and how much ability you had, cognitively, to express yourself . . . . I won't suggest to you that this is an easy process because it's not and the evidence is challenging, but I would,

again, urge you to look at this through [the child]'s eyes and walk in her shoes. Try to figure out whether or not [the child] was intentionally trying to lie to you, really, about anything of significance.

*Id.* ¶ 26. On appeal, we rejected the defendant's claim that his attorney had rendered ineffective assistance by failing to object to the prosecutor's argument. We suggested that the prohibition set forth in *Todd* applies when a prosecutor "unfairly appeals to the sympathies, passions, and prejudices of the jury." *Id.* ¶ 27 (quotation simplified). By contrast, we held that the prosecutor in *Isom* was asking the jury to assess the child-witness's "*credibility* as a *witness* in light of her age." *Id.* ¶ 31 (emphases added). In this sense, we concluded that the prosecutor's argument was "not an improper appeal to the jury to base its decision on sympathy for the victim but rather a means of asking the jury to reconstruct the situation in order to decide whether" the witness's testimony was "plausible." *Id.* (quotation simplified).

¶51 The same is true here. In the portion of the rebuttal argument at issue, the prosecutor asked the jurors to think about how they would "describe" the abuse, and he further asked them to consider how a person would "make up a memory like that." As in *Isom*, this seems to have been an argument about the credibility and plausibility of Justin's testimony, as opposed to being an appeal to sympathy or passion. As a result, Counsel could have reasonably decided that any objection would be futile.

¶52 Second, even if there had been some basis for objecting, we also believe that Counsel could reasonably have decided not to do so. Utah's appellate courts have been wary of concluding that a defense attorney was ineffective for not objecting to an argument made by a prosecutor in a closing argument. According to our supreme court, when reviewing "an attorney's failure to object to a prosecutor's statements during closing argument, the question is not whether the prosecutor's comments were proper, but

*whether they were so improper* that counsel's only defensible choice was to interrupt those comments with an objection." *State v. Houston*, 2015 UT 40, ¶ 76, 353 P.3d 55 (emphasis in original, quotation otherwise simplified). And this wariness makes jurisprudential sense. When a prosecutor makes a potentially objectionable statement in a closing argument, it presents something of a dilemma for defense counsel. On the one hand, counsel can object and ask the court to instruct the jury to disregard the statement. But there are also "many legitimate, strategic reasons why an attorney might choose to not object to a statement made during closing argument." *State v. Harris*, 2024 UT App 191, ¶ 21, 562 P.3d 1215 (quotation simplified), *cert. denied*, 564 P.3d 961 (Utah 2025). These include

> the possible fear that objecting would call attention to the improper statements and suggest to the jury that they were damaging when counsel felt they were not, the concern that the jury was weary and inattentive to the prosecutor and that objecting would only serve to focus [its] attention on the remark, and the concern that an objection would create antipathy to the defense if the jury perceived that counsel's repeated objections were only prolonging the proceedings.

*Id.* (quotation simplified). Given these concerns, in many if not most instances, defense counsel enjoys "the prerogative . . . to swallow their tongue instead of making an objection." *State v. Hummel*, 2017 UT 19, ¶ 110, 393 P.3d 314.

¶53 Here, the statements in question alluded to testimony that was not only damaging to the defense, but very graphic too. Under these circumstances, we believe that Counsel could have reasonably decided that an objection might further focus the jury's attention on these details and that it was accordingly better to leave the comments alone. For these reasons, we reject

Christian's assertion that Counsel performed deficiently by not objecting.

## IV. Rule 23B Remand

¶54   Along with his brief, Christian has filed a motion for a remand pursuant to rule 23B of the Utah Rules of Appellate Procedure. That rule allows "[a] party to an appeal in a criminal case" to file a motion asking this court to "remand the case to the trial court for entry of findings of fact, necessary for [this] court's determination of a claim of ineffective assistance of counsel." Utah R. App. P. 23B(a). Such a motion will be granted "only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *Id.* If the proffered evidence does not "meet the test for ineffective assistance of counsel, then there is no reason to remand the case." *State v. Samples*, 2022 UT App 125, ¶ 57, 521 P.3d 526 (quotation simplified).

¶55   In his motion, Christian requests a remand to create a record to support the claim that Counsel was ineffective for not calling Coworker as a witness at trial. In support of his motion, Christian has included affidavits from both Coworker and Counsel. As explained in the motion and the affidavits, Coworker was Christian's romantic partner during part of the period in which the abuse allegedly occurred—in Coworker's affidavit, he says that their relationship began in "late October/early November 2009." Christian argues that Coworker should have been called to testify about two things: (1) their work schedules during that period and (2) Christian's aversion to "spanking for a sexual purpose." But even with the proffered affidavits, we see no basis for concluding that Counsel performed deficiently.

¶56   As an initial matter, we note that Counsel's decision not to call Coworker was an informed decision. In his affidavit, Counsel noted that he "had listed [Coworker] as a potential witness for Mr. Christian's trial" but that he had ultimately chosen to not call

Coworker as a witness. As explained shortly, Counsel then gave certain reasons why he thought Coworker's testimony may have been either unhelpful or even problematic.

¶57 "When reviewing an ineffective assistance claim, we must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Forbush*, 2024 UT App 11, ¶ 76 (quotation simplified), and the defendant carries the burden of persuading us otherwise, *see State v. Schoenenberger*, 2024 UT App 187, ¶ 64, 562 P.3d 1174, *cert. denied*, 568 P.3d 261 (Utah 2025). Moreover, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland v. Washington*, 466 U.S. 668, 690 (1984). In light of Counsel's affidavit, it's clear that Counsel was aware of Coworker's testimony and chose not to call him. Christian therefore faces the uphill task of persuading us that the potential gains from this testimony were so pronounced that Counsel simply could not have reasonably decided not to call him.

¶58 **Work Schedule.** At trial, Christian testified that at the beginning of the relevant period, he worked a shift from 6:00 a.m. to 2:30 p.m., which caused him to get home between 4:30 and 5:00 p.m.; he also said that when he switched to a 10:30 a.m. to 7:00 p.m. shift sometime in 2009, he would get home between 9:00 and 10:00 p.m. Christian's daughter and Justin attended the same school, and Christian testified that he was "[a]t work" when his daughter (and, by implication, Justin) would be coming home from school. To somewhat varying degrees, Christian's ex-wife, ex-mother-in-law, and daughter also corroborated Christian's claim about his schedule. Christian's ex-wife testified that she thought Christian "[n]ever" would have had "an opportunity to molest" Justin "in the afternoon of a weekday" and that Christian was not home when their daughter "returned home from school." Christian's ex-mother-in-law testified that she would get home from work around 4:00 or 5:00 p.m., and she agreed with Counsel

that the children were "usually home" but that Christian was "usually" not home. Christian's daughter testified that Christian was "[a]lmost never" home when she returned from school and that Christian usually got home around 6:45 or 7:00 p.m.

¶59 Coworker would not have added much to this testimony. In his affidavit, Coworker stated, "Most days, we did not leave work until about 7 or 8 p.m." Coworker also said that he "had a handwritten calendar from 2009 detailing [his] work scheduling," and he said that this calendar "support[ed]" the claim that he and Christian "did not leave work until 7 or 8 p.m."

¶60 But even with this potential testimony, Counsel could have reasonably decided that the potential gains were marginal. After all, the relationship between Christian and Coworker only began partway through the period in which the abuse allegedly happened. And even there, Coworker talked about their schedules on "[m]ost days," not "all days," so even with this testimony, there would have conceivably been some days in which Christian left earlier and still could have abused Justin. And this is also consistent with Counsel's own understanding of Coworker's potential testimony. In his affidavit, Counsel stated that Coworker's "testimony would have been offered to support the fact that on some unspecified work days, . . . Christian had diminished time to be alone with the alleged victim during the time period when the crimes were alleged to have been committed." Counsel further said that Coworker "was not able to recall specific dates." As a result, it seems unclear whether the potential testimony would have been any more helpful than the testimony that the jury had already heard, and it also seems that it still would have left open the possibility for Justin's claims to be true.

¶61 Moreover, there would have been a potential drawback to calling Coworker to testify. Again, Coworker said that he had a "romantic relationship" with Christian. And this seems to have

partially tied into why the two were driving home together and Coworker was tracking Christian's schedule so closely. But in his affidavit, Counsel said that he "recall[ed] weighing the potential benefit" of Coworker's testimony "against the potential for disparaging . . . Christian's character." According to Counsel, he was concerned about the potential negative effects of highlighting for the jury that Christian was engaging in this romantic relationship while he "was married."

¶62   In response to this concern, Christian argues in his rule 23B filings that it "was unreasonable to worry about the jury viewing [Christian] as unfaithful" to his ex-wife "when there was already testimony that their marriage was struggling, and [Christian] was gay." But as the State points out, putting Coworker on the stand to testify about their romantic relationship would have placed the infidelity squarely before the jury. And this could well have been damaging to the defense. At trial, Christian's ex-wife not only vouched for Christian's character, but she also testified that they "talked about almost everything." She further testified that she hadn't seen indications of the kind of behavior Justin had described—the pink underwear and makeup and the like. In closing argument, Counsel referred to that as "powerful testimony." But if part of the defense's pitch turned on suggesting that it would have been hard to sneak this kind of behavior by Christian's ex-wife, then presenting the jury with testimony from Christian's extramarital partner may have undermined this message. After all, it would have given the jury an unavoidable visual image of a relationship that Christian had managed to hide from her, and it would have given the prosecutor the opportunity to explore this during cross-examination of Coworker too.

¶63   In light of the fact that the jury had already heard testimony about Christian's schedule from other witnesses, we believe that Counsel could have reasonably decided that the potential gains from Coworker's testimony about Christian's

schedule (which, again, were potentially marginal) were not worth the potential distraction or costs.

¶64 **Spanking.** So too with Coworker's proposed testimony about spanking. In Coworker's affidavit, he stated, "During my romantic relationship with [Christian], I asked him to spank me. [Christian] was adamantly against engaging in that type of behavior in our relationship. [Christian] told me that he equated spanking to his children, and he would not engage in spanking for a sexual purpose."

¶65 As the State points out, if Coworker had offered this testimony, the prosecutor could have readily countered it. After all, it would've been easy enough for the State to argue that there may have been a difference between Christian's romantic or erotic interests relating to his adult partner and whatever it was that was motivating him to sexually abuse the neighbor child. In any event, the potential drawbacks identified above of putting Coworker on the stand would have been even more pronounced if the purpose had been to discuss their sexual relationship. If Counsel had put Coworker on the stand and then asked him about Christian's sexual interests, this would have directly focused the jury's attention on Christian's extramarital sexual life. Again, this would have further highlighted his secretiveness and infidelity as related to his ex-wife, thereby undermining the defense's strategy of calling her to testify about Christian's openness and candor within their relationship.

¶66 *Strickland* recognizes that there are "countless ways to provide effective assistance in any given case" and that "even the best criminal defense attorneys would not defend a particular client in the same way." 466 U.S. at 689. For purposes of a deficient performance analysis, "the question is not whether some strategy other than the one that counsel employed looks superior given the actual results of trial. It is whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time

context of trial." *Forbush*, 2024 UT App 11, ¶ 76 (quotation simplified).

¶67 Under these circumstances, Counsel could reasonably have decided that any potential gains from Coworker's proposed testimony weren't worth the risks. As a result, we conclude that, even with the proffered affidavits, Christian has not shown that Counsel performed deficiently. We accordingly decline to order the rule 23B remand.

CONCLUSION

¶68 For the foregoing reasons, we affirm Christian's convictions and deny his request for a rule 23B remand.

───────────